Revised April 14, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-41250

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ALLEN PERRY SOAPE, JR,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Eastern District of Texas
_____

March 9, 1999

Before KING, Chief Judge, POLITZ and BENAVIDES, Circuit Judges.

KING, Chief Judge:

Defendant-appellant Allen Perry Soape, Jr. appeals his conviction and sentence for conspiracy to fraudulently use counterfeit access devices, unauthorized access devices, and access devices issued to another person; fraudulent use of unauthorized access devices; fraudulent use of counterfeit access devices; fraudulently effecting transactions with access devices issued to another person; use of a fictitious name or address; and false use of a social security account number.  We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

On August 2, 1995, defendant-appellant Allen Perry Soape, Jr. was transferred to the Jefferson County Jail from the Angelina County Jail, where he had been incarcerated after his arrest on charges unrelated to the instant case. Soape turned over to Jefferson County authorities a number of credit and identification cards, and both Soape and the jail official who processed him executed a property log. While Soape was an inmate at the Jefferson County Jail, Steven Michael Alexander contacted Captain Michael Hebert, an internal affairs investigator for the Jefferson County Sheriff's Department, to complain that Soape possessed credit cards issued in Alexander's name. Hebert retrieved Soape's personal effects from the property room at the jail and found the following documents:

1.    Two Direct Merchants Bank MasterCard credit cards in the name of Steven M. Alexander;

2.    One NationsBank/NCNB Interact Pulse card in the name of Steven M. Alexander;

3.    One Radio Shack American Technology Store card in the name of Steven M. Alexander;

4.    One Boilermaker's National Health and Welfare Fund card in the name of Steven M. Alexander;

5.    One NationsBank MasterCard credit card in the name of Steven M. Alexander, Jr.; and

6.    One Texas Department of Public Safety temporary driver's license in the name of Steven Michael Alexander.

Soape was charged by an indictment filed in the Eastern District of Texas with (1) one count of conspiring with Joy A. Lovett[1] to violate 18 U.S.C. § 1029(a)(1), (2), and (5); (2) three counts of fraudulently using unauthorized access devices in violation of 18 U.S.C. § 1029(a)(2); (3) one count of fraudulently using a counterfeit access device in violation of 18 U.S.C. § 1029(a)(1); (4) three counts of fraudulently effecting transactions with access devices issued to another person in violation of 18 U.S.C. § 1029(a)(5); (5) one count of using a fictitious name or address in violation of 18 U.S.C. § 1342; and (6) three counts of using a false social security account number in violation of 42 U.S.C. § 408(a)(7)(B). Soape pleaded not guilty to all counts and proceeded to trial pro se.

The evidence at trial consisted of the following. First, Alexander testified that he met and befriended Soape in the 1970s. During this time, Soape had access to Alexander's home and personal effects and sometimes stayed at Alexander's residence. From 1989 to 1992, Alexander permitted Soape to use two of his credit cards, but he ultimately requested their return, paid off the remaining balances, and canceled the cards. Alexander also testified that at one point, Lovett informed him

---

[1] Lovett and Soape were married prior to trial, and the indictment was amended to read "Joy A. Soape, aka Joy A. Lovett." In order to distinguish Mrs. Soape from her husband, however, this opinion refers to her as "Lovett" and to Mr. Soape as "Soape."

3

that Soape had several credit cards in Alexander's name.  With respect to the documents retrieved from the Jefferson County Jail, Alexander stated that he never applied for, or had any knowledge of, the Direct Merchants Bank MasterCards, the NCNB/Interact Pulse card, the Radio Shack card, or the NationsBank MasterCard, and that he did not recognize some of the addresses the applications and statements for these accounts listed as his.  Furthermore, he testified, he never possessed the temporary driver's license found among Soape's personal effects, and it bore an address with which he was unfamiliar.

In addition to Alexander, several bank employees and government investigators testified regarding the specific documents at issue.  Susan Dare of Medras, Inc., Direct Merchants Bank's parent company, testified that someone had applied by phone for a credit card account in the name of Steven M. Alexander, using his social security account number and an address in Lufkin, Texas, and that the Direct Merchants Bank MasterCards found in Soape's possession were issued on that account.  Don Walton of NationsBank testified that someone opened a NationsBank checking account in the name of Steven M. Alexander of Lufkin, Texas with the same social security account number and that the NationsBank/NCNB Interact Pulse card found in Soape's possession was issued on that account.  Two wire transfers had been made from that account to an account in Soape's name at First National Bank in Port Neches, Texas.  Walton also stated

4

that an individual had applied for a NationsBank Gold MasterCard account using the name Steven M. Alexander of Orange, Texas, with Alexander's social security account number, and that NationsBank had issued a credit card on that account. After the account was opened, a request form seeking to add the names "J.A. Lovett" and "A.P. Soape" to the account was submitted, and additional Gold MasterCards were issued in those names. The form included the signatures of the primary cardholder, Alexander, and the two individuals who were to be added. Walton further identified two Wal-Mart credit card receipts on the NationsBank MasterCard in J.A. Lovett's name, two rental car contracts charged on the NationsBank MasterCard in Alexander's name, a NationsBank MasterCard charge to STS Audio Video in the name of J.A. Lovett, and a convenience check, written on the same NationsBank MasterCard account, from Steven M. Alexander, Jr. to J.A. Lovett. Next, Jan Williamson of the Texas Department of Public Safety testified that two licenses had been issued in the name of Steven Michael Alexander, but that one license bore a post office box address and Soape's photograph as well as Alexander's true address. Two United States Postal Service employees testified that someone representing himself to be Steven Alexander applied for the post office boxes in Lufkin and Orange, Texas that appeared on the Direct Merchants Bank MasterCard statements and the NationsBank Gold MasterCard application, respectively. Finally, Nancy Grinnell of the Social Security Administration

5

testified that the social security account number used in the accounts described above was assigned to Steven Michael Alexander, Jr.

In addition, several store employees testified about specific usages of the cards at issue. Kristi Maxon, a Wal-Mart employee, stated that both Wal-Mart receipts were from transactions using NationsBank MasterCards issued in the name of J.A. Lovett; one carried the signature of J.A. Lovett and the other of "S.A. and maybe Steven Alexander." James Bailey, a manager of STS Audio Video, stated that he sold a satellite system to a customer who presented a credit card in the name of J.A. Lovett and that the signature on the receipt was "J.A. Lovett." He also prepared a work order directing his employees to install the system at Joy Lovett's residence. According to Bailey, the customer provided the address and signed the work order "Joy Lovett." Bank employees testified that more than $1000.00 was charged on the NationsBank MasterCard account in 1993, 1994, and 1995 and on the Direct Merchants account in 1995.

Finally, prosecution witness Melissa McCaa, Lovett's daughter, took the stand. McCaa recalled that Soape had used a driver's license bearing Alexander's name but his own photograph to make either a deposit or a withdrawal at NationsBank in Lufkin, Texas and that he had paid for a hotel room and a rental car in Las Vegas, Nevada with a NationsBank MasterCard in Alexander's name. She confirmed that Lovett possessed a

6

NationsBank MasterCard in the name of J.A. Lovett and had used it to withdraw money from a Pulse automatic teller machine, make purchases at Wal-Mart, and buy a satellite system. Finally, McCaa identified the signature and address on the STS receipt as Lovett's; the telephone number on the STS work order as Soape and Lovett's home number; the telephone number on the NationsBank wire transfer documents, the NationsBank MasterCard application, the NationsBank MasterCard request form, and the Las Vegas car rental agreements as Soape and Lovett's cellular telephone number; the signatures on the NationsBank MasterCard form requesting additional cards as Lovett's and Soape's; and the signature endorsing the convenience check as Lovett's.

Soape called several defense witnesses whose testimony suggested that Alexander had authorized Soape to use his name and credit cards. An officer at the Angelina County Jail, Lieutenant Price, stated that he contacted a person whose name appeared on a credit card in Soape's possession and was advised by that person that Soape had permission to use the card. Although he could not remember the identity of that person, Alexander's name sounded familiar. Captain Hebert testified that he talked to Price after Price had contacted this person, and Price indicated that he had spoken with Alexander and that Alexander had given Soape permission to use the cards. Finally, Melinda Knost told the jury that she observed Alexander give Soape a temporary driver's license and credit cards and sponsored a power of attorney, which

7

she had notarized, granting Soape permission to act in Alexander's affairs.

The jury convicted Soape on all counts. The district court sentenced him to eighteen months in prison and a three-year term of supervised release on each of the thirteen counts against him, all sentences to run concurrently. It also imposed a special assessment of $50.00 for each count for a total of $650.00 and restitution in the amount of $18,632.60. Soape appealed his conviction and sentence.

## II. DISCUSSION

Soape raises four distinct challenges to the judgment of the district court. First, he argues that the evidence is insufficient to support his convictions for fraudulent use of counterfeit access devices under 18 U.S.C. § 1029(a)(1) and for conspiracy under 18 U.S.C. § 371. Second, he contends that some of the counts in the indictment are multiplicitous with other counts. Third, he claims that the district court violated his Sixth Amendment right to compulsory process by denying certain of his requests for subpoenas. Finally, he charges that the district court denied him due process and the effective assistance of counsel by prohibiting contact with McCaa. We address each of these contentions in turn.

8

**A. Sufficiency of the Evidence**

**1. Section 1029(a)(1)**

According to Soape, the evidence is insufficient to support his § 1029(a)(1) convictions because the term "counterfeit access device" does not encompass otherwise legitimate access devices procured by fraud, but only devices that were actually created or manufactured by persons without the right to do so. The district court's interpretation of a federal statute is a question of law that we review de novo. See United States v. Courtney, 979 F.2d 45, 48 (5th Cir. 1992).

We begin, of course, with the statute itself. Section 1029(a)(1) provides that "[w]hoever . . . knowingly and with intent to defraud produces, uses, or traffics in one or more counterfeit access devices . . . shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section." The statute defines "access device" as including "any card . . . that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds." Id. § 1029(e)(1). A "counterfeit access device" is "any access device that is counterfeit, fictitious, altered, or forged, or an identifiable component of an access device or a counterfeit access device." Id. § 1029(e)(2).

9

We do not believe that this definition excludes credit cards obtained through the submission of false information. The term "counterfeit" means "[m]ade in imitation of something else; 'imitation', not genuine." 3 OXFORD ENGLISH DICTIONARY 1027 (2d ed. 1989), while "fictitious" denotes something "[c]ounterfeit, 'imitation', sham; not genuine," 5 id. at 873, and "forged" refers to an object "[m]ade in fraudulent imitation of something genuine; counterfeit, false, spurious," 6 id. at 69. Soape's credit cards are fraudulent imitations of genuine cards, which must not only be issued by authorized banks and credit card companies (as Soape's undoubtedly were), but also obtained with truthful information. In other words, a "genuine" credit card must be legitimately and honestly obtained; Soape's cards, being but imitations of these, are "counterfeit," "fictitious," and "forged."

Our reading of § 1029(a)(1) is in accord with our own precedent and that of our sister circuits. In United States v. Brewer, 835 F.2d 550 (5th Cir. 1987), a hacker called a long distance telephone company's toll free phone number, punched in possible access code combinations until he found valid ones that allowed him to obtain telephone service, and sold the codes to an undercover agent. See id. at 551-52. We held that his actions violated § 1029(a)(1). The codes were "counterfeit," we said, because they were "fictitious" and "forged." See id. at 553. This was so even though Brewer's codes were genuine:

10

> [W]e are unpersuaded by Brewer's broader argument that a legitimate access code cannot ever be "counterfeit." Brewer argues that the codes he obtained were genuine code numbers placed in the [long distance telephone company's] computer and thus were not "counterfeit." However, an equally plausible interpretation is that Brewer did not "obtain" the codes from the computer but fabricated codes that just happened to be identical to the [company's] codes. By analogy, someone who manufactures phony credit cards is no less a "counterfeiter" because he happens to give them numbers that match valid accounts.

Id. at 554. Unlike Brewer, of course, Soape did not himself fabricate counterfeit access devices. But he unquestionably caused their manufacture. Confronted with the same situation, the Ninth Circuit concluded in United States v. Brannan, 898 F.2d 107 (9th Cir. 1990), that the term "counterfeit access device," as used in § 1029(a)(1), encompasses access devices acquired through the submission of false information:

> What Brannan did was use fictitious information to cause the victim companies to issue counterfeit cards. By his conduct, Brannan caused the manufacture of an invalid device. The conduct was functionally equivalent to the manufacture of a counterfeit device by Brannan himself. We believe that Congress by this statute intended to proscribe use of such devices.
>    Because Brannan's conduct does constitute employment of counterfeit access devices under the statute, we uphold the conviction. According to Webster's New International Dictionary, (2d ed. 1941), the word "counterfeit" denotes "that which is made in imitation of something with an intent to deceive." Brannan here initiated and contributed to the process of making illegitimate credit cards, even if he did not personally perform every step of the procedure.

Id. at 109. In the same way, Soape counterfeited cards as effectively--and perhaps more so--as if he had personally manufactured them.

11

The legislative history of § 1029 supports our broad interpretation of the definition of "counterfeit access device." First, we note that Congress intended to draft a broad statute so as to close loopholes in existing federal legislation addressing credit card abuse and counterfeiting. See S. REP. NO. 98-368, at 2-5 (1984), reprinted in 1984 U.S.C.C.A.N. 3647, 3648-51; H.R. REP. NO. 98-894, at 4-5, 6-8, 19 (1984), reprinted in 1984 U.S.C.C.A.N. 3689, 3689-91, 3692-94, 3705; United States v. Hughey, 147 F.3d 423, 434 (5th Cir. 1998). Second, the legislative history indicates that a card containing some valid components may still be counterfeit within the meaning of § 1029(a)(1). See S. REP. NO. 98-368, at 3, reprinted in 1984 U.S.C.C.A.N. 3649 ("Cards are counterfeited through two popular techniques. Blank plastic cards may be made to look like legitimate cards through 'silkscreening' or photo offset printing, and valid account numbers obtained by fraudulent means are embossed onto the card. Alternately, a lost or stolen card may be embossed with a new account number."); H.R. REP. NO. 98-894, at 7, reprinted in 1984 U.S.C.C.A.N. 3693 ("One common counterfeiting technique utilizes 'silkscreening' or offset printing of the registered design or service marks of an organization followed by embossing fraudulently obtained valid account numbers on a card."). Similarly, the cards in this case contained fraudulently obtained names and account numbers; they differ from the counterfeit cards described in the House Report

12

only in that they were physically manufactured by a bank or credit card company rather than by the defendant himself. That, we think, is a distinction without a difference. See Brannan, 898 F.2d at 109-10 ("The House Report evinces an intent that the definition of counterfeit access devices be construed broadly and we believe that the language may be fairly interpreted to sanction the widespread fraudulent inducement of credit card generation by legitimate issuers as well as the relatively rare homemade creation of convincing replicas."). Because Soape's credit cards are counterfeit access devices, the evidence was sufficient to support his § 1029(a)(1) conviction.[2]

## 2. Section 371

Soape also argues that the evidence is insufficient to support his conviction for conspiracy under 18 U.S.C. § 371 because the government failed to show that he and his only

---

[2] At oral argument, Soape's counsel also presented a relatively skeletal contention that credit cards obtained through the submission of false information cannot be both "counterfeit" under 18 U.S.C. § 1029(a)(1) and "unauthorized" under 18 U.S.C. § 1029(a)(2) and that therefore, if we affirm Soape's conviction under the former statute, we must vacate his convictions under the latter. A "counterfeit" card, counsel asserted, is by definition "fictitious," and § 1029(a)(2), which criminalizes certain uses of "unauthorized" cards, presupposes a genuine card that is later used without authority. We rejected a similar argument in Brewer, concluding that the terms "counterfeit" and "unauthorized" as used in § 1029 are not mutually exclusive. See Brewer, 835 F.2d at 553; see also Brannan, 898 F.2d at 110 ("[T]here is no indication in the legislative history that Congress intended subsections (a)(1) and (a)(2) to be mutually exclusive."); United States v. Gugino, 860 F.2d 546, 549 (2d Cir. 1988) ("[I]t does not follow that the same access device cannot be both unauthorized and counterfeit at the same time.").

13

alleged co-conspirator, Lovett, agreed to engage in unlawful conduct and that Lovett had the requisite intent to commit the offenses that were allegedly the object of the conspiracy. In short, Soape claims that he is not guilty of conspiracy because he conspired with no one. We review such a claim in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the jury, see United States v. McCord, 33 F.3d 1434, 1439 (5th Cir. 1994), and must uphold the conviction if a rational jury could have found that the government proved the essential elements of the crime charged beyond a reasonable doubt, see United States v. Ruiz, 986 F.2d 905, 908 (5th Cir. 1993). It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt. See United States v. Lopez, 74 F.3d 575, 577 (5th Cir. 1996). This standard of review is the same regardless of whether the evidence is direct or circumstantial. See United States v. Cardenas, 9 F.3d 1139, 1156 (5th Cir. 1993).

To establish a violation of 18 U.S.C. § 371, the government must prove beyond a reasonable doubt (1) that two or more people agreed to pursue an unlawful objective, (2) that the defendant voluntarily agreed to join the conspiracy, and (3) that one or more members of the conspiracy committed an overt act to further the objectives of the conspiracy. See United States v. Campbell, 64 F.3d 967, 974 (5th Cir. 1995). Moreover, the government must

14

prove "at least the degree of criminal intent necessary for the substantive offense itself."  United States v. Osunegbu, 822 F.2d 472, 475 (5th Cir. 1987) (quoting United States v. Ortiz-Loya, 777 F.2d 973, 981 (5th Cir. 1985)) (internal quotation marks omitted).  Although such intent may not be proven solely by a family relationship, see United States v. Ismoila, 100 F.3d 380, 389 (5th Cir. 1996), it may be shown by circumstantial evidence, see United States v. Beckner, 134 F.3d 714, 719 (5th Cir. 1998), and "when inferences drawn from the existence of a family relationship or 'mere knowing presence' are combined with other circumstantial evidence, there may be sufficient evidence to support a conspiracy conviction."  United States v. Williams-Hendricks, 805 F.2d 496, 503 (5th Cir. 1986).

After a careful review of the record, we believe that there is sufficient evidence to support the conclusion that Lovett agreed with Soape to engage in unlawful conduct and that she had the requisite intent to commit the underlying offenses, each of which requires that the defendant act "knowingly and with intent to defraud."  18 U.S.C. § 1029(a)(1), (2), (5).  Lovett signed a request form, on which her own cellular phone number appeared as the phone number of the primary cardholder, to add herself to a MasterCard account in Alexander's name.  She used the credit card issued on that account on a number of occasions, including the charging of $1400.00 at STS Audio Video and $207.16 at Wal-Mart; in addition, someone used her card to charge $249.12 at Wal-Mart,

15

signing the receipt "S.A. and maybe Steven Alexander."  Lovett also endorsed a convenience check for $1200.00, purportedly written by Alexander on the NationsBank MasterCard account but bearing an address in Lufkin, Texas, a city in which Alexander did not live.  There are, of course, innocent explanations for Lovett's behavior; for example, Alexander <u>could</u> have, as Soape claims, authorized Lovett's charges on his account, or Lovett <u>could</u> have been her husband's trusting dupe, honestly believing that his friend was willing to subsidize her Wal-Mart purchases and satellite system and neglecting to notice or question the appearance of her own phone number as the primary cardholder's and the mistake in Alexander's address on a check made out to her.  But, as we observed above, it is not necessary that circumstantial evidence of conspiracy be wholly inconsistent with every conclusion except that of guilt.  <u>See</u> <u>Lopez</u>, 74 F.3d at 577.  A rational jury could have concluded from the combination of Lovett's own actions and her close relationship with Soape that she agreed with him to violate § 1029(a)(1), (2) and (5) and that she had the requisite intent to commit the offenses proscribed by those statutes.  <u>Compare</u> <u>Osunegbu</u>, 822 F.2d at 476-77 (finding sufficient evidence to support a wife's conviction for conspiring with her husband to steal mail where she had called to inquire whether there was mail at a post office box to which stolen packages were being sent, opened a box addressed to someone else, removed the tags from the skirt inside, and thrown

away the box, from which the mailing label had been removed), with United States v. Forrest, 620 F.2d 446, 450-51 (5th Cir. 1980) (finding insufficient evidence to support a wife's conviction for possession of stolen goods where she had done no more than send a message to her husband, who was involved in the criminal scheme, and accepted money from one of his employees at his direction). The evidence is therefore sufficient to support Soape's conspiracy conviction.

**B. Multiplicity**

Soape also argues that Counts Two, Three, and Four of his indictment, which charge violations of 18 U.S.C. § 1029(a)(2), are multiplicitous with Counts Six, Seven, and Eight, which allege violations of 18 U.S.C. § 1029(a)(5). We review issues of multiplicity de novo. See United States v. Cluck, 143 F.3d 174, 179 (5th Cir. 1998) (citing United States v. Dupre, 117 F.3d 810, 818 (5th Cir. 1997)).

We turn first to the government's contention that Soape has waived the multiplicity issue. Although a complaint about the multiplicity of sentences can be raised for the first time on appeal, see United States v. Stovall, 825 F.2d 817, 821 (5th Cir. 1987) (citing Osunegbu, 822 F.2d at 481 n.26), a defendant must raise multiplicity of the indictment as a defense before trial pursuant to Federal Rule of Criminal Procedure 12(b)(2) to preserve error, unless he can show cause for failing to do so,

17

see FED. R. CRIM. P. 12(f); Stovall, 825 F.2d at 821 (citing United States v. Gerald, 624 F.2d 1291, 1300 (5th Cir. 1980)). From his brief, it appears that Soape's multiplicity complaint goes to his indictment alone, not to his sentence: In his summary of argument, he states in a section labeled "Multiplicity" that "[t]he government charged Mr. Soape with the same offense three times; counts two, three, and four charge the same crimes as do counts six, seven, and eight. The elements of the offenses as charged are identical" (emphasis added). He makes no mention of the sentences imposed on the allegedly multiplicitous counts. Similarly, in the body of his brief, Soape argues that the charges against him are multiplicitous but does not refer to any multiplicity of sentence. It thus appears that Soape's challenge goes only to his indictment, and he was therefore required to raise his multiplicity objection prior to trial or show cause for failing to do so. He did not do so, and he may not now challenge his convictions as multiplicitous. See United States v. Galvan, 949 F.2d 777, 781 (5th Cir. 1991); United States v. Lemons, 941 F.2d 309, 316 n.4 (5th Cir. 1991); United States v. Marroquin, 885 F.2d 1240, 1245 (5th Cir. 1989).[3]

_____

[3] We are aware that some of our fellow courts of appeals have treated a failure to challenge the multiplicity of an indictment before trial somewhat differently. The Second Circuit has reviewed a claim such as Soape's where the defendant made no multiplicity objection before trial but did so afterward in a motion to set aside the verdict. See United States v. Chacko, No. 98-1087, 1999 WL 101272, at *3-*4 (2d Cir. Mar. 1, 1999). The Eighth Circuit has applied the plain error standard in a case

18

Even if Soape could challenge his indictment on appeal, the § 1029(a)(2) counts are not multiplicitous with the § 1029(a)(5) counts.[4]  In general, "multiplicity" is the charging of a single offense under more than one count of an indictment.  See <u>United States v. Nguyen</u>, 28 F.3d 477, 482 (5th Cir. 1994).  "The chief danger raised by a multiplicitous indictment is the possibility that the defendant will receive more than one sentence for a single offense."  <u>Cluck</u>, 143 F.3d at 179 (quoting <u>United States v. Swaim</u>, 757 F.2d 1530, 1537 (5th Cir. 1985) (internal quotation

---

in which the defendant failed to challenge the multiplicity of his indictment prior to trial.  See <u>United States v. Jackson</u>, 155 F.3d 942, 947 (8th Cir. 1998).  Unlike the defendant in <u>Chacko</u>, however, Soape raises his multiplicity challenge for the first time on appeal, and our court has consistently declined to review such an argument for plain error, <u>see, e.g.</u>, <u>Galvan</u>, 949 F.2d at 781 ("Galvan acknowledges not having filed the requisite pre-trial motion; because she did not, she <u>may not challenge the convictions as multiplicious</u>.") (emphasis added).

[4]  The concurrent sentence doctrine would not apply in Soape's case.  Under this doctrine, a tool of judicial economy, the existence of one valid sentence makes unnecessary the review of other sentences that run concurrently with it. See <u>Stovall</u>, 825 F.2d at 824.  Applying the doctrine in a manner that removes the adverse collateral consequences of the sentence, we have adopted the policy of vacating the unreviewed sentence and suspending imposition of that sentence. See <u>id.</u>  We cannot apply the doctrine at all, however, where not all the sentences are concurrent, including where the defendant's liability for a special assessment depends on the validity of each of the convictions.  See <u>Ray v. United States</u>, 481 U.S. 736, 737 (1987). While the district court sentenced Soape to concurrent 18-month terms of imprisonment and three-year terms of supervised release for each of the thirteen counts on which he was convicted, it also imposed a $50.00 special assessment for each count.  Soape's monetary sanctions therefore depend on the validity of each count, including the allegedly multiplicitous ones, and the concurrent sentence doctrine does not apply.

marks omitted).  "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."  Blockburger v. United States, 284 U.S. 299, 304 (1932); see Cluck, 143 F.3d at 179; Nguyen, 28 F.3d at 482.  When the legislature writes two criminal statutes, and each statute contains an independent element from the other statute, we presume that it intends to define two separate offenses that generally entail two punishments.  See United States v. Cruce, 21 F.3d 70, 73 (5th Cir. 1994) (citing Missouri v. Hunter, 459 U.S. 359, 367 (1983)).  The fact that "there is a substantial overlap in the proof offered to establish the crimes" does not prohibit conviction and punishment for both.  See Stovall, 825 F.2d at 822.

The focus in determining the issue of multiplicity is on the statutory elements of the offenses, not on their application to the facts of the specific case before the court.  See United States v. Flores-Peraza, 58 F.3d 164, 167 (5th Cir. 1995) ("The question for the court to determine is not, as Flores argues, whether his specific violation of § 1326(a) necessarily encompassed or included his specific violation of § 1325(a), but whether all violations of § 1326(a) constitute violations of § 1325(a).") (citing United States v. Singleton, 16 F.3d 1419, 1422 (5th Cir. 1994)).  Because § 1029(a)(2) and § 1029(a)(5)

20

each require proof of an element that the other does not, an indictment charging that the same conduct violates both is not multiplicitous.

Section 1029(a)(2) prohibits "knowingly and with intent to defraud traffic[king] in or us[ing] one or more unauthorized access devices during any one-year period, and by such conduct obtain[ing] anything of value aggregating $1,000 or more during that period . . . if the offense affects interstate or foreign commerce." Thus, to establish that Soape committed an offense under this section, the government was required to prove the following elements:

1. That Soape used one or more unauthorized access devices;
2. That Soape thereby obtained something of value aggregating at least $1000.00 during a one-year period;
3. That Soape acted knowingly and with intent to defraud; and
4. That Soape's conduct affected interstate or foreign commerce.

Section 1029(a)(5) criminalizes "knowingly and with intent to defraud effect[ing] transactions, with 1 or more access devices issued to another person or persons, to receive payment or any other thing of value during any 1-year period the aggregate value of which is equal to or greater than $1,000 . . . if the offense affects interstate or foreign commerce." To establish that Soape violated § 1029(a)(5), the government was required to prove the following elements:

1. That Soape effected transactions with one or more access devices issued to another person or persons;

21

2.  That Soape thereby obtained something of value aggregating at least $1000.00 during a one-year period;
3.  That Soape acted knowingly and with intent to defraud; and
4.  That Soape's conduct affected interstate or foreign commerce.

The first element is clearly different. Conviction under § 1029(a)(2) requires proof that the access device be "unauthorized," meaning "lost, stolen, expired, revoked, canceled, or obtained with intent to defraud." 18 U.S.C. § 1029(e)(3). Conviction under § 1029(a)(5) requires proof that the access device be "issued to another person or persons." An access device can be "unauthorized" in the sense that it is expired, revoked, or canceled, but not be issued to another person. By the same token, an access device can be issued to another person, and used to effect transactions with intent to defraud, without having been lost, stolen, expired, revoked, canceled, or even obtained with intent to defraud, for example if one individual allows another to charge certain items on his valid card, but the latter goes beyond the scope of that authorization. Thus, even if Soape had properly preserved error, his multiplicity argument would lack merit.

## C.  Sixth Amendment Right to Compulsory Process

Soape next contends that the district court's denial of his subpoena requests under Federal Rule of Criminal Procedure 17(b)[5]

---

[5]  The Federal Rules of Criminal Procedure create a mechanism to realize the Sixth Amendment right to compulsory process:

for the long distance telephone records of the Angelina County Sheriff's Department and for Robert Inselmann, an attorney who had represented him in the past, violated his Sixth Amendment right to compulsory process.  We have "generally given district courts wide discretion in determining whether subpoenas should issue under Rule 17(b)," United States v. Ramirez, 765 F.2d 438, 441 (5th Cir. 1985), but only "within the limits imposed by the Constitution," id. (quoting United States v. Webster, 750 F.2d 307, 329 (5th Cir. 1984)).  Whether the trial court's refusal to subpoena a witness violates the Sixth Amendment is, if course, a question of law that we review de novo.  See United States v. Lampton, 158 F.3d 251, 255 (5th Cir. 1998).

The Sixth Amendment provides in relevant part, "In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor." U.S. CONST. amend. VI.  The Supreme Court has recognized that this right "is an essential attribute of the adversary system itself" and that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense."  Taylor v.

---

> The court shall order at any time that a subpoena be issued for service on a named witness upon an ex parte application of a defendant upon a satisfactory showing that the defendant is financially unable to pay the fees of the witness and that the presence of the witness is necessary to an adequate defense.

FED. R. CRIM. P. 17(b).

<u>Illinois</u>, 484 U.S. 400, 408 (1988).[6]  Accordingly, "at a minimum . . . criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt."  <u>Pennsylvania v. Ritchie</u>, 480 U.S. 39, 56 (1987).  The compulsory process right is not absolute, however; when requesting a court to subpoena a witness, a defendant has the duty to demonstrate the necessity of the witness's testimony.  <u>See</u> <u>United States v. Gonzales</u>, 79 F.3d 413, 424 (5th Cir. 1996); <u>see also</u> <u>United States v. Valenzula-Bernal</u>, 458 U.S. 858, 867 (1982) (holding that a defendant cannot establish a violation of the constitutional right to compulsory process merely by showing that he was deprived of certain testimony but must make some plausible showing of how that

---

[6]  A defendant's right to present witnesses in his favor is also a fundamental element of due process of law, as the Supreme Court decided when holding that the Sixth Amendment's compulsory process guarantee applies to the states:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.  Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process of law.

<u>Washington v. Texas</u>, 388 U.S. 14, 19 (1967).  Soape claims only a violation of his Sixth Amendment rights, not his Fifth Amendment due process rights.

24

testimony would have been both material and favorable to his defense).  The government may respond by demonstrating that the facts upon which the defense relies are inaccurate, or that the evidence sought is immaterial, irrelevant, cumulative or otherwise unnecessary.  See Gonzales, 79 F.3d at 424; Webster, 750 F.2d at 329-30.

With these principles in mind, we turn to Soape's subpoena requests.  First, Soape requested a subpoena duces tecum for the long distance telephone records of the Angelina County Sheriff's Department.  On appeal, Soape contends that the district court's refusal to issue such a subpoena prevented him from obtaining evidence going to the heart of his defense, namely that Alexander had authorized him to use the credit cards.  The telephone records, Soape claims, would have demonstrated that the individual whom Price called and who told him that Soape had permission to use the credit cards was, in fact, Alexander.  This evidence was critical, Soape argues, because Price testified at trial that he could not remember that person's identity and because the government asserted during closing argument that Price could not have called Alexander because he had dialed a local number although Alexander lived outside Angelina County.

When requesting the district court to issue a subpoena, however, Soape had a duty to demonstrate the necessity of the telephone records.  See Gonzales, 79 F.3d at 424.  During the ex parte hearing at which he asked the court to subpoena the

25

records, Soape made no effort to explain why they were necessary to his defense.  Indeed, even if he had made the same arguments that he now does, he would not have met the threshold showing of necessity.  As Soape concedes in his opening brief, the records could only have bolstered his contention that he acted with Alexander's permission.  Such authorization is not, however, a defense to the offenses with which Soape was charged.  The indictment alleged that Soape violated 18 U.S.C. § 1029(a)(1), (2), and (5), 18 U.S.C. § 1342, and 42 U.S.C. § 408(a)(7)(B).[7] Even if Alexander had given Soape permission to apply for and use credit cards in his name, they still would be "counterfeit" within the meaning of § 1029(a)(1) because they would have been obtained through the submission of information that was false as to Soape.[8]  Such cards also would be "unauthorized" under § 1029(a)(2) because they would have been obtained with the intent to defraud banks and credit card companies into believing

---

[7]  In addition, it also charged him with conspiracy to violate § 1029(a)(1), (2), and (5), in violation of 18 U.S.C. § 371, and aiding and abetting the violation of § 1029(a)(1), (2), and (5), in violation of 18 U.S.C. § 2.

[8]  Don Walton of NationsBank testified that the bank never would have issued the NationsBank MasterCard if it had known that Soape was using Alexander's name and social security account number, even if Alexander had authorized him to do so, and would have blocked the card immediately upon discovering that the person who had applied for it had not used his true name and social security account number.  Thus, it appears that, at least from the issuer's point of view, a credit card obtained with false personal information would not be genuine, even if the applicant had the permission of the individual as to whom that information was true.

26

that they were issuing cards to Alexander.  Cf. United States v. Jacobowitz, 877 F.2d 162, 165-67 (2d Cir. 1989) (holding that even as to a credit card obtained by the cardholder from the issuer without fraudulent intent, use of that card by a third person to defraud the issuer with the consent of the holder violates § 1029(a)(2)).  And, of course, there is no doubt that the cards would have been "issued to another person" within the meaning of § 1029(a)(5) even if Alexander had approved Soape's conduct.

Proof of Alexander's consent does not help Soape on his other convictions, either.  Section 1342 of Title 18, United States Code, provides:

> Whoever, for the purpose of conducting, promoting, or carrying on by means of the Postal Service, any scheme or device mentioned in section 1341 of this title or any other unlawful business, uses or assumes, or requests to be addressed by, any fictitious, false, or assumed title, name, or address or name other than his own proper name, or takes or receives from any post office or authorized depository of mail matter, any letter, postal card, package, or other mail matter addressed to any such fictitious, false, or assumed title, name, or address, or name other than his own proper name, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 1342.  The consent of the individual whose true name is used by another is not a defense to this section; Alexander's consent to Soape's use of his name and address do not make them any less fictitious, false, or assumed as to Soape.  Finally, 42 U.S.C. § 408(a)(7)(B) prohibits a person from, for certain purposes, "with intent to deceive, falsely represent[ing] a

27

number to be the social security account number assigned by the Commissioner of Social Security to him or to another person, when in fact such number is not the social security account number assigned by the Commissioner of Social Security to him or to such other person." As with 18 U.S.C. § 1342, Alexander's consent to Soape's use of Alexander's social security number does not make that number any less false as to Soape, nor does it negate any intent on Soape's part to deceive persons other than Alexander.

Second, Soape complains of the district court's refusal to issue a subpoena for Inselmann, an attorney who he claims possesses a power of attorney that would have tended to undermine the government's argument that the document sponsored by Knost was a recent fabrication. Like the telephone records, Soape claims, the power of attorney proves that he acted with Alexander's permission, and depriving him of compulsory process for securing its presence violated his Sixth Amendment rights. Soape filed two written motions for a subpoena for Inselmann, neither of which shows any necessity for Inselmann's testimony. He also made an oral ex parte application for such a subpoena, in which he similarly failed to demonstrate that Inselmann's testimony and the power of attorney in his possession was necessary to his defense and indeed was unable coherently to explain the gist of Inselmann's expected testimony. And even if he had made the same arguments before the district court that he

28

does on appeal, he would not have met the threshold showing of necessity. Inselmann and the power of attorney could only show that Soape had Alexander's permission to act as he did. As we explained above, such authorization was not a defense to the crimes with which Soape was charged. Accordingly, we find that the district court's refusal to issue a subpoena for the Angelina County Sheriff's Department telephone records and for Inselmann did not violate Soape's Sixth Amendment right to compulsory process.

## D. Fifth Amendment Right to Due Process and Sixth Amendment Right to Counsel

Finally, Soape complains that the district court denied him due process and the effective assistance of counsel. On March 17, 1997, the government moved to modify the conditions of Soape's pretrial release so as to preclude him from having any contact with prosecution witness McCaa. The motion alleged that on March 14, 1997, Soape and Lovett placed an audio tape in McCaa's mailbox intended to harass and intimidate her and that McCaa was concerned for her welfare and safety. The court granted the motion. On appeal, Soape, who was acting pro se at trial, contends that the ban on contact with McCaa precluded him from properly preparing his defense and thereby violated both his Fifth Amendment right to due process and his Sixth Amendment right to effective assistance of counsel. We review such

29

constitutional questions de novo.  See United States v. Osborne, 68 F.3d 94, 98 (5th Cir. 1995).

Soape is correct that as a general rule, "[w]itnesses, particularly eye witnesses, to a crime are the property of neither the prosecution nor the defense.  Both sides have an equal right, and should have an equal opportunity, to interview them."  Gregory v. United States, 369 F.2d 185, 188 (D.C. Cir. 1966).  This does not mean, however, that a trial court may not limit a defendant's access to witnesses to prevent harassment or other wrongdoing.  See United States v. Whittington, 783 F.2d 1210, 1219 (5th Cir. 1986) (holding that a prosecutor may investigate prospective defense witnesses if his conduct is neither prompted by the possibility of their testifying nor harassing or threatening, because "[t]he prosecutor's hands are not tied so tightly as to prevent good faith efforts to avert perjury or to investigate past offenses"); United States v. Heatley, 994 F. Supp. 483, 489 (S.D.N.Y. 1998) (limiting defense access to prosecution witnesses where such contact would place the witnesses in "substantial and immediate risk").[9]  In this case, the district court determined that Soape's conduct toward

---

[9]  We also note that "a government witness who does not wish to speak to or be interviewed by the defense prior to trial may not be required to do so."  United States v. Caldwell, 750 F.2d 341, 346 (5th Cir. 1984) (quoting United States v. Benson, 495 F.2d 475, 479 (5th Cir. 1974)).  Although McCaa was ultimately called only by the government, Soape expressed an intent to call her as a defense witness at various times during this criminal proceeding.

McCaa was harassing and intimidating,[10] and it imposed the ban on contact to protect her and the integrity of the trial process. In doing so, it did not infringe upon Soape's Fifth and Sixth Amendment rights. The challenged order explicitly permitted Soape to subpoena McCaa, and it did not prohibit him from requesting alternative methods of ascertaining McCaa's testimony, such as an interview before the trial court or an opportunity for voir dire when the witness testified. Cf. Parsons v. United States, 919 F. Supp. 86, 90 (N.D.N.Y. 1996) ("In any event, faced with the belief that he was unable to have personal contact with [the witness], the reasonable course would have been for petitioner's counsel to obtain the court's permission to speak with her for the purpose of preparing a defense. There is no indication in the record that [counsel] pursued such an avenue. The court therefore rejects the premise advanced by petitioner that his counsel was precluded by a court order from having any contact with a potential witness in order to prepare a defense."). Accordingly, we conclude that the ban on contact

---

[10] Soape urges us to find the ban on contact with McCaa unconstitutional because the district court later determined, during the sentencing hearing, that the tape was not an attempt to obstruct justice. We decline to do so. We see no reason why a post-trial determination that a particular action of the defendant does not trigger an obstruction of justice enhancement under United States Sentencing Guidelines Manual § 3C1.1 should render unconstitutional a trial court's pretrial decision to impose limitations on defendant-witness contact because of the same action, which at the time appeared harassing or intimidating.

with McCaa did not rise to the level of a constitutional violation.

### III.  CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.