**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Michael Owen BRANNAN,**
**Defendant–Appellant.**

**No. 89–50016.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 9, 1989.

Decided March 12, 1990.

H. Dean Steward, Directing Atty., Federal Public Defender's Office, Santa Ana, Cal., for defendant-appellant.

Edward R. McGah, Asst. U.S. Atty., Santa Ana, Cal., for plaintiff-appellee.

Before GOODWIN, Chief Judge, and SCHROEDER and O'SCANNLAIN, Circuit Judges.

GOODWIN, Chief Judge:

Michael Owen Brannan appeals his conviction following a jury trial for use of a counterfeit access device, in violation of 18 U.S.C. § 1029(a)(1). On appeal Brannan challenges the district court's denial of his pre-trial motion to suppress evidence seized from his home by United States Secret Service agents and the adequacy of the government's proof that he used "counterfeit access devices" within the meaning of 18 U.S.C. § 1029(a)(1). We affirm.

For three years before his arrest in April, 1988, Brannan obtained and used numerous credit cards in names other than his own. Brannan procured these cards by submitting applications containing false or inflated information to such companies as American Express, Bullocks, and Torrey Pines Bank.

## A. *Suppression Motion*

■ On April 28, 1988, Secret Service agents, acting without a warrant but with the consent of Brannan's wife, searched Brannan's residence and seized evidence of the offenses charged in the indictment. Mrs. Brannan was a joint owner of the house, but recently had moved out of the residence. Brannan had been arrested and charged with spousal abuse in February, 1988. After his wife moved out, Brannan changed the house locks.

■ The Supreme Court has held that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock,* 415 U.S. 164, 170, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). "Common authority" rests upon mutual use of the property by those generally having joint access or control such that it is reasonable to recognize that each of the parties has the right to permit inspection and has assumed the risk that the

other party might consent to a search. *United States v. Yarbrough,* 852 F.2d 1522, 1534 (9th Cir.), *cert. denied,* — U.S. ——, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988).

In *United States v. Long,* 524 F.2d 660 (9th Cir.1975), this court held that a wife who was the joint owner of a house with her husband had the right to give federal agents permission to enter and search the premises, even though she had moved out and her husband had changed all of the locks. *Id.* at 661. We rejected the defendant's contention that his wife lacked joint access or control of the house within the meaning of *Matlock. Id.* Our decision in that case was influenced by the fact that Mrs. Long effectively had been forced to leave the house due to fear of her husband and had left "a substantial amount" of her personal possessions in the house, which she recovered while the agents conducted their search. *Id.* at 661 n. 1. The decision in *Long* controls the analysis here. It therefore was reasonable for the trial court to conclude that Susan Brannan retained actual authority to consent to the search of the Brannan house. We find no error in the district court's denial of Brannan's motion to suppress the evidence seized from the search.

## B. *Motion for Acquittal*

■ Brannan was convicted under 18 U.S.C. § 1029(a)(1) for using "counterfeit access devices." Under § 1029(e)(2), a counterfeit access device is defined as "any access device that is counterfeit, fictitious, altered, or forged ..." The district court found that Brannan's procurement and use of credit cards in names similar to but not exactly the same as his own [1] constituted employment of "wholly fictitious" access devices which, albeit genuinely made by the issuers, qualified them as "counterfeit" within the meaning of § 1029(e)(2).

---

**1.** Counts 5, 7, and 8 of the first superseding indictment (the counts of conviction) involved the following credit cards:

| Count | Credit Card | Name Issued Under |
|-------|-------------|-------------------|
| 5 | Pep Boys | Micheal D. Brannon |
| 7 | Visa–Western Savings & Loan | Micheal O. Brannam |
| 8 | Visa–Torrey Pines Bank | Michael D. Brannan, Jr. |

Brannan contests the determination that he used "counterfeit" access devices under the terms of § 1029(e)(2). He concedes that he misused genuine credit cards, but argues that a conviction under § 1029(a)(1) must be supported by proof of *counterfeit* access devices. Misuse of genuine but "unauthorized" access devices is proscribed by § 1029(a)(2) of the statute, but there is a thousand-dollar threshold required for conviction. § 1029(e)(3) defines "unauthorized access device" as "any access device that is lost, stolen, expired, revoked, or obtained with intent to defraud." Brannan contends that because the credit cards he used can be characterized only, if at all, as "unauthorized access devices," his conviction under § 1029(a)(1) cannot be sustained.

In reviewing a denial of a motion for acquittal, this court examines the evidence in the light most favorable to the government in order to determine whether any rational trier of fact could find the defendant guilty beyond a reasonable doubt. *United States v. Murray*, 751 F.2d 1528, 1534 (9th Cir.), *cert. denied sub nom.*, by *Moore v. United States*, 474 U.S. 979, 106 S.Ct. 381, 88 L.Ed.2d 335 (1985). The district court's interpretation of the applicable statute is reviewed *de novo*. *United States v. Mehrmanesh*, 689 F.2d 822, 827 (9th Cir.1982).

As Brannan points out, because 18 U.S.C. § 1029 is of relatively recent vintage, there is a dearth of case law analyzing its various provisions. Brannan would have this court interpret "counterfeit," as used in § 1029(a)(1), to mean access devices actually *manufactured* by the defendant himself, and not those fraudulently caused to be issued by the victimized companies. The argument flies in the face of Congress's intent in enacting the statute to close the loopholes in extant federal legislation addressing credit card abuse and counterfeiting. *See* H.R.Rep. No. 894, 98th Cong., 2d Sess. ("House Report"), *reprint-*

*ed in* 1984 U.S.Code Cong. & Ad.News ("USCCAN") 3689, 3691.

Under section 1029(e)(2), "counterfeit access device" is defined to mean any access device that is "counterfeit, fictitious, altered, or forged" or an "identifiable component of an access device or counterfeit access device." According to the legislative history of the statute, "[t]he term 'fictitious' is intended to cover a number of different types of counterfeit devices, including representations, depictions or facsimiles of an access device." *Id.* at 19, USCCAN at 3705. This definition of "fictitious" appears to cover articles which mimic or approximate access devices distributed by legitimate issuers, but not, as is the case here, credit cards which actually are produced by the victimized companies in response to the submission of fictitious information. We therefore hold that the district court mischaracterized Brannan's conduct in finding that his conviction under § 1029(a)(1) was warranted for his procurement and use of "fictitious" access devices. What Brannan did was use fictitious information to cause the victim companies to issue counterfeit cards. By his conduct, Brannan caused the manufacture of an invalid device. The conduct was functionally equivalent to the manufacture of a counterfeit device by Brannan himself. We believe that Congress by this statute intended to proscribe use of such devices.

Because Brannan's conduct does constitute employment of *counterfeit* access devices under the statute, we uphold the conviction. According to *Webster's New International Dictionary*, (2d ed. 1941), the word "counterfeit" denotes "that which is made in imitation of something with an intent to deceive." Brannan here initiated and contributed to the process of making illegitimate credit cards, even if he did not personally perform every step of the procedure.[2] The House Report evinces an intent that the definition of counterfeit access devices be construed broadly and we believe

---

**2.** Brannan's conduct here brings to mind the practice of the European cuckoo, which lays a genuine egg in the nests of other birds which

then unwittingly produce counterfeit robbins but genuine cuckoos. *See Webster's* at 640.

that the language may be fairly interpreted to sanction the widespread fraudulent inducement of credit card generation by legitimate issuers as well as the relatively rare homemade creation of convincing replicas. *See* House Report at 19, USCCAN at 3705.

By contrast "unauthorized access device", under § 1029(e)(3) refers to an access device that is "lost, stolen, expired, revoked, cancelled or obtained with intent to defraud." The focus of this subsection appears to be upon access devices generated legitimately which subsequently are misused. *See id.* at 14, USCCAN at 3700 ("[t]he dichotomy essentially is to distinguish between counterfeit access devices and genuine access devices being used without authority.") The fact that the credit cards involved here were "obtained with intent to defraud" does not preclude the application of § 1029(a)(1); there is no indication in the legislative history that Congress intended subsections (a)(1) and (a)(2) to be mutually exclusive. *See United States v. Gugino*, 860 F.2d 546, 549 (2d Cir. 1988); *United States v. Brewer*, 835 F.2d 550, 553 (5th Cir.1987).

In rejecting a threshold requirement for violations of § 1029(a)(1), the House Report observed that "[c]ounterfeiting such cards is analogous to the counterfeiting of U.S. currency." *Id.* at 17, USCCAN at 3703. Congress thus apparently intended to draw a distinction, manifested in subsections (a)(1) and (a)(2), between acts which result in the generation of *new*, illegitimate cards and those which constitute misuse and abuse of devices which were valid when originally issued. Submission of a credit card application under a fictitious name, if accepted, causes the manufacture of a counterfeit device just as effectively as does the physical creation of usable copies and constitutes the kind of activity Congress sought to reach with § 1029(a)(1).

AFFIRMED.