# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

KEVIN LLOYD STANLEY, AKA
Kevin Stanley,
          *Defendant-Appellant.*

No. 10-50206

D.C. No.
2:09-cr-00486-
ODW-1

OPINION

Appeal from the United States District Court
for the Central District of California
Otis D. Wright, District Judge, Presiding

Argued and Submitted
June 7, 2011—Pasadena, California

Filed August 2, 2011

Before: Robert R. Beezer, Stephen S. Trott, and
Pamela Ann Rymer, Circuit Judges.

Opinion by Judge Trott;
Dissent by Judge Beezer

9915

## COUNSEL

Carlton F. Gunn, Federal Public Defender's Office, Los Angeles, California, for the defendant-appellant.

Yvonne L. Garcia, United States Attorney's Office, Los Angeles, California, for the plaintiff-appellee.

## OPINION

TROTT, Circuit Judge:

Kevin Stanley conditionally pleaded guilty pursuant to Federal Rule of Criminal Procedure 11(a)(2) to one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). As part of his plea, he reserved the right to appeal the denial of his motion to suppress the offending material located during a search of his computer, a search conducted by federal agents led by Agent Michael Prado pursuant to the alleged consent of his one-time friend and now fiancee, Tiana Stockbridge. We have jurisdiction over this timely appeal in accord with 28 U.S.C. § 1291, and we affirm.

## I

### The Computer's History

The computer on which Stanley kept his collection of child pornography had a complicated history of ownership, custody, and control. During the time Stanley and his girlfriend Tiana Stockbridge lived together before he was imprisoned in 2004 for child molestation, Stockbridge and Stanley jointly owned and used the computer. Each had his and her own directories and folders on the computer which were tied to individual user names, "Kevin" for Stanley and "Tiana" for Stockbridge. Stanley had his material "password-protected"

during that time and took steps to hide his cache of child pornography in the computer's subsystems.

We predicate our statement that the computer was jointly owned on the district court's factual finding that Stockbridge was a "co-owner," a finding that necessarily rejected Stanley's and Stockbridge's protestations to the contrary. The district court's findings regarding the computer are supported by (1) Stockbridge's earlier statements to Agent Prado and to David Trimm, (2) Trimm's statements to Agent Prado, and (3) Stanley's original statement to Agent Prado that he and Stockbridge jointly owned it. More about this issue in Part IV of this opinion.

When Stanley and Stockbridge ended their relationship in 2004, Stanley moved and took the computer with him. Subsequently, he removed the password-protection from the computer, leaving Stockbridge's files intact.

In 2004, after Stanley was arrested on state child molestation charges, Stockbridge went to Stanley's residence and took possession of the computer, at the behest of Stanley's parents. Stanley acquiesced in her acquisition and possession of it, expecting that he would get it back after serving his prison sentence, presumably with the child pornography intact — which he says caused him to engage in conduct resulting in his conviction of child molestation. Neither Stanley nor his parents placed any restrictions on Stockbridge's use of or access to the computer.

About one and one-half years later, the computer "crashed" and ceased to function, as computers are wont to do. Stockbridge gave it to a friend to fix, but he failed to do so. Thus, in early 2006, Stockbridge gave it to another friend to repair, one David Trimm. By education and experience Trimm was qualified to take on this task.

As Trimm examined the unprotected contents of the computer, he noticed files on it clearly suggesting child pornogra-

phy. This discovery posed serious problems for Trimm because he was on federal probation himself for a drug felony, so he called Stockbridge, advised her of his predicament, and asked her permission to turn the computer over to his probation officer. According to Trimm, she gave him permission to do so, and he did.

Next, U.S. Probation Officer Daniel Vianello called Immigration and Customs Enforcement Special Agent Michael Prado who handles these matters and told him that Trimm, one of his supervisees, had given him a computer hard drive that possibly contained child pornography.

A few days later, Agent Prado met with Trimm, who filled him in on the computer's history and what he believed it contained. Trimm told Agent Prado that Stanley and Stockbridge were joint owners of the device. Agent Prado then took possession of it.

The next day, Agent Prado contacted Stockbridge by telephone. His purpose was to determine — as Trimm had told him — that she was a joint owner of the computer and thus could consent to its search. According to Agent Prado's sworn declaration, Stockbridge confirmed that she "jointly owned" it and consented to its search for illicit material. She said (1) that because of his conviction for child molestation, she was concerned that Stanley was involved in the possession and distribution of child pornography, and (2) that she wished to have it examined to see if there was illegal material on it. She was correct in her assumptions, and the contents of the computer became the basis for Stanley's conditional plea and conviction.

## II

## Consent to Search[1]

---

[1]Although Agent Prado believed he had appropriately secured Stockbridge's consent to search the computer, "in an abundance of caution" he

## A.

The district court denied Stanley's motion to suppress his cache of illicit material. In so ruling, the court implicitly and understandably rejected Stockbridge's declaration prepared for the suppression hearing. In the declaration, she partially contradicted Agent Prado's recitation of their telephone conversation. Now, she could not remember whether or not she consented to the search, but she denied telling Agent Prado that she suspected Stanley of harboring pornography.

Stockbridge's credibility in connection with her declaration was seriously — if not fatally — undermined by her recent engagement to be married to Stanley, his record as a child molester notwithstanding. The circumstance of her engagement was brought to the court's attention both in her declaration and by the prosecution during its argument on the issue of consent. This factor plainly falls into the category of potential witness bias.

The Supreme Court has said that

> Bias is a term used in the "common law of evidence" to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his [or her] testimony in favor of or against a party. . . . Proof of bias is almost always relevant because the [factfinder] and

then secured a federal search warrant authorizing a forensic examination of it. Agent Prado gave the computer and a copy of the warrant to Special Agent Ulises Solorio for just such an examination. But because of the press of official business, Agent Solorio did not examine the computer until after the warrant expired. However, this circumstance is not germane to our disposition of this case, because as Stanley's counsel conceded during oral argument, if the agents had consent, then the warrant is irrelevant. Agent Solorio was aware of Stockbridge's consent when he finally searched the computer and found Stanley's contraband.

weigher of credibility, has historically been entitled
to assess all evidence which might bear on the accu-
racy and truth of a witness' testimony.

*United States v. Abel*, 469 U.S. 45, 52 (1984). The Court said
also that "[a] successful showing of bias on the part of a wit-
ness would have a tendency to make the facts to which he [or
she] testified less probable in the eyes of the [factfinder] than
it would be without such testimony." *Id.* at 51.

After a lengthy hearing which included the testimony of
Agent Prado and Stanley plus the admission in evidence of
Stockbridge's declaration as direct testimony, the court made
these findings of fact:

> [F]rom all objective indicia, the government was cer-
> tainly reasonable in concluding that . . . Stockbridge
> had authority to consent and, in fact, did give con-
> sent and that the search was done pursuant to that
> consent.

The court also held that Stanley had no reasonable expecta-
tion of privacy in the computer while for two years it was in
Stockbridge's possession and control, and found that she was
a "co-possessor, a co-owner, a common user and therefore
had the authority to give consent to the search." The factual
record sufficiently supports the district court's findings and
conclusions.

## B.

Stanley argues unconvincingly that because his porno-
graphic material was "password-protected" *before* he went to
prison, and that prior to going to prison his files and hers were
segregated from each other, Stockbridge did not and could not
have had the authority two years later to consent to the search.
This argument fails. Among other deficiencies in this argu-
ment, when the computer came into Stockbridge's sole pos-

session and custody after Stanley went to prison, his material was no longer password-protected, as his attorney conceded during oral argument. *Cf. Trulock v. Freeh*, 275 F.3d 391, 403 (4th Cir. 2001) (although a third party may have had authority to consent to a general search of a jointly-used computer, that authority did not extend to another user's password-protected files).

Moreover, at the time she consented to the search, Stockbridge had had total and unfettered control of the unprotected computer for all purposes for two uninterrupted years during Stanley's time in prison, as demonstrated by her statements to Agent Prado and her delivery of it to two different friends for repair. Stanley's own testimony confirms this arrangement:

Q. (to Stanley) And with respect to the computer that both you and Ms. Stockbridge used, did you at times allow Ms. Stockbridge to access files in your portion of the computer?

A. (by Stanley) Yes.

Q. And was your portion of the computer password protected?

A. Earlier on it was but not at the time.

Q. Not at what time?

A. The time when I moved to Porterville, California.

Q. So even though you placed your trust in Ms. Stockbridge, she could have accessed your files when you were in prison?

A. Yes.

## C.

**[1]** "A third party has actual authority to consent to a search of a container if . . . the third party has mutual use of the container and joint access or control over [it.]" *United States v. Ruiz*, 428 F.3d 877, 880 (9th Cir. 2005) (quoting *United States v. Fultz*, 146 F.3d 1102, 1105 (9th Cir. 1998)). Although Stanley cannot be said under these circumstances to have abandoned the computer, he certainly cannot have entertained a legitimate expectation of privacy in it once it was delivered unconditionally and without password-protection to its co-owner, knowing that she could access his files. As the Supreme Court held in *United States v. Matlock*, 415 U.S. 164, 170 (1974), "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." Expanding on this holding, the Court also said,

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at 172 n.7 (internal citations omitted). We reiterated this principle in *United States v. Brannan*, 898 F.2d 107, 108 (9th Cir. 1990), saying, " 'Common authority' rests upon mutual use of the property by those generally having joint access or control such that it is reasonable to recognize that each of the parties has the right to permit inspection and has assumed the risk that the other party might consent to a search."

**[2]** Finally, we follow the Supreme Court's guidance in *Frazier v. Cupp*, 394 U.S. 731 (1969). In that case, Frazier and his cousin Rawls had both been using Frazier's duffle bag. *Id.* at 740. In dismissing Frazier's Fourth Amendment claim that Rawls had no authority to consent to a search of the bag, which turned up incriminating evidence against Frazier, the Court said,

> Petitioner argues that Rawls only had actual permission to use one compartment of the bag and that he had no authority to consent to a search of the other compartments. We will not, however, engage in such metaphysical subtleties in judging the efficacy of Rawls' consent. Petitioner, in allowing Rawls to use the bag and in leaving it in his house, must be taken to have assumed the risk that Rawls would allow someone else to look inside. We find no valid search and seizure claim in this case.

*Id.* Here, we conclude similarly that when Stanley and his parents turned over possession, use, and control of the computer to Stockbridge, Stanley — like Frazier — assumed the risk that she would allow someone else to look inside.

## III

### Apparent Authority

**[3]** In any event, even if we were to agree with our dissenting colleague that Stockbridge was not a co-owner of the computer, the district court also held that Agent Prado "was certainly reasonable in concluding" "from all objective indicia" in the record that "Stockbridge had authority to consent." In other words, the doctrine of apparent authority suffices in Fourth Amendment terms to render this search reasonable.[2]

---

[2]Given the district court's explicit conclusion in support of its denial of Stanley's motion to suppress, Stanley's objection to our consideration of the doctrine of apparent authority is not well-taken.

On de novo review of this mixed question of fact and law, we agree.

**[4]** The Supreme Court spelled out the relevant inquiry in *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990):

> As with other factual determinations bearing upon search and seizure, determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief' " that the consenting party had authority over the premises?

(quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968) (omission in original).

**[5]** Here, without revisiting them at this juncture, the totality of the facts and circumstances known to Agent Prado at the time of the search satisfy this test. As in the case of *United States v. Buckner*, 473 F.3d 551 (4th Cir. 2007), Agent Prado and his assistants "did not have any indication" from Stockbridge, "or any of the attendant circumstances," that Stanley's child pornography files were password-protected. *Id.* at 555. Indeed, they were not. Thus, the agents were justified in relying on Stockbridge's consent.

## IV

### The Dissenting Opinion

**[6]** Our respected colleague's dissenting opinion takes issue with the district court's resolution in favor of the prosecution of competing factual scenarios, one from the prosecution, and another from the defense. The dissenting opinion overlooks a difference between our legal responsibility as an appellate court, on one hand, and the factfinding prerogative of a trial court, on the other. Our function does not entail

retrying the factual issues in a case — here, primarily (1) whether Stockbridge was the co-owner in possession of the computer, (2) whether she factually consented to the search of the computer, or not, and (3) whether she displayed the indicia of authority to do so. On appeal, we accept a district court's findings of fact unless they are clearly erroneous. As we said in *Rand v. Rowland*, 154 F.3d 952, 957 n.4 (9th Cir. 1998) (en banc) (quoting *Epstein v. MCA, Inc.*, 126 F.3d 1235, 1253 n.18 (9th Cir. 1997)), "[f]indings of fact are made on the basis of evidentiary hearings and usually involve credibility determinations, which explains why they are reviewed deferentially under the clearly erroneous standard." This rule follows Federal Rule of Civil Procedure 52(a), which provides that "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." For these reasons, the Supreme Court has given us this directive:

> But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error.

*Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985). *See also United States v. Working*, 224 F.3d 1093, 1102 (9th Cir. 2000) (en banc) (" 'Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' ") (quoting *Anderson*, 470 U.S. at 574).

**[7]** As applied to this case, the dissent's reliance on "facts" plainly rejected by the district court — and for good reason — is misplaced. Invoking what Stockbridge claimed in her declaration is now irrelevant, as are her denials and contradictions of Agent Prado's testimony prepared for the suppression hearing. The district court plainly did not credit her testimony.

We do not comprehend the import of the dissent's statement that "[b]ecause the government chose not to cross-examine Stockbridge, her testimony went unchallenged." This assertion trespasses upon the factfinding and credibility prerogatives of the district court and is not consistent with Rule 52(a), *Anderson v. Bessemer City*, and our own standard of review jurisprudence. Moreover, the government did challenge her testimony — with contradictory evidence from Agent Prado. We understand how the district court looked askance at her newly-minted declaration in favor of her recently engaged to be spouse.

AFFIRMED.

---

BEEZER, Circuit Judge, dissenting:

The court provides two separate rationales for affirming the district court's denial of Stanley's motion to suppress: (1) the district court properly concluded that Stanley's ex-girlfriend at the time, Tiana Stockbridge ("Stockbridge"), had common authority to consent to the search, or apparent authority to do so; and (2) the district court properly concluded that Stanley had no expectation of privacy in the computer's contents. I respectfully disagree.

In this case, law enforcement agents relied on an invalid warrant to search a criminal defendant's computer without his consent. The government's reliance on the defendant's ex-girlfriend's consent is terribly flawed and cannot justify an otherwise invalid search under the Fourth Amendment. As I explain below, the district court's factual findings were clearly erroneous.

Accordingly, I would reverse the district court's decision not to suppress this evidence.

# I

## Consent

The "cardinal principle" in Fourth Amendment search and seizure jurisprudence is that " 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment.' " *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted)). This rule, however, is not ironclad, and like most constitutional edicts, there are exceptions. *Id*. One such exception to the warrant requirement is consent, given either by the defendant himself or by a third party who has "common authority" over the property. *Schneckloth v. Busta-monte*, 412 U.S. 218, 222 (1973). But if the government wishes to introduce evidence seized during a warrantless search, it has the burden of demonstrating that an exception to the cardinal principle exists. *Id*.; *see also Vale v. Louisiana*, 399 U.S. 30, 34 (1970); *United States v. Davis*, 332 F.3d 1163, 1168 n.3 (9th Cir. 2003).

Because Stanley himself never gave consent to search his computer, the government had the burden to prove that a third-party — in this case, Stockbridge, who was Stanley's ex-girlfriend at the time — had actual or apparent authority to consent to the search, and did in fact consent to the search.

For her part, Stockbridge unequivocally denies that she ever provided consent in the first place, an assertion that the court dismisses out of hand.[1] But even if Stockbridge did consent to the search, the question remains whether she had the authority do so. The court concludes that she did for three reasons. First, the court concludes that Stockbridge was a co-

---

[1]Although Stockbridge was present and available for cross-examination, the government decided not to question her, meaning her testimony went uncontested.

owner of the computer, which enabled her to consent to the search. Second, even if Stockbridge was not a co-owner, the court argues that her joint-use of the computer gave her common authority to consent to a search of its files. And finally, even if Stockbridge was not a co-owner or did not have common authority to consent, the court believes that the agents properly relied upon her apparent authority to consent to the search.

As explained below, the court's reasoning finds no support either in the record or in this court's precedent.

## A.   Co-Ownership

The court writes that while Stanley and Stockbridge lived together (before they broke up), they "jointly owned and used the computer." This claim cannot be squared with the facts. To begin, there is no factual basis for this conclusion anywhere in the record. The district court's conclusion that Stockbridge was a co-owner was clearly erroneous.

Between 1996 and 2004, Stanley and Stockbridge were in a romantic relationship. During their relationship, they lived together in Barstow, California. In 2001, as a gift, Stanley's father gave him the laptop computer in question. There is no evidence whatsoever that Stanley's father gave the laptop to both of them; indeed, it is clear from the record that the gift was for Stanley alone.

Although the computer was his alone, Stanley allowed Stockbridge to use the laptop while they were living together. However, Stanley made sure to limit Stockbridge's access. Two different user accounts were set up on the computer, and during their cohabitation Stanley's account was password protected, while Stockbridge's account was *not* password protected. Stockbridge only used the computer to store her music files; she did not access Stanley's files because she did not

believe she had the right to do so. Stanley also did not believe Stockbridge had any right to access his files.

In 2004 the couple broke up, and Stanley moved to Porterville, California, taking his computer with him. After he stopped living with Stockbridge, Stanley removed the password protection that locked his user account.

Later that year, while he was living in Porterville, Stanley was arrested and sent to state prison for an unrelated criminal charge. Before his arrest Stanley kept his personal property (including his laptop computer) at a friend's house, where he had been staying. After his arrest, the property was moved to Stanley's parents' home. While Stanley was in prison Stockbridge went to his parents' home and took possession of some of his property to hold while Stanley was in prison, including: music discs, video games, clothing, and his laptop computer. Both agree that Stockbridge was to hold Stanley's property while he was in prison, but that he was to receive all of it back once he was released.

But because Stanley did not anticipate his arrest, he did not have a chance to reinstall his password before entering prison. As a result, when Stockbridge took possession of the computer, Stanley's files and directories were not password protected. However, the computer still had two separate accounts that Stanley had created for himself and Stockbridge.

Two critical facts from this record demonstrate that Stanley did not co-own his computer with Stockbridge. First, the computer was a gift to Stanley from his father. Second, Stanley affirmed his *sole ownership* by taking the computer with him when the couple split up and he moved to Porterville. The district court never explains how an ex-girlfriend can jointly own a gift that her ex-boyfriend's father gave to him, not to her.

Additionally, even when the couple was living together, Stanley only gave Stockbridge limited access to the computer.

Throughout their joint use, Stanley and Stockbridge had an understanding that Stockbridge could not access Stanley's files; there is no evidence that this understanding changed when Stanley went to prison. If she were a co-owner, why would her access be so limited?

Given these facts, it's hard to find that Stockbridge was a co-owner. Instead of considering these details before settling on its co-ownership theory, the court's decision relies almost entirely on Agent Prado's declaration. However, in his testimony, Agent Prado never said that Stockbridge used the word "owned," and Agent Prado himself equivocated on whether *he* used the word "ownership," or whether he used the word "possess" or "use" when he was questioning Stockbridge. That Agent Prado later clarified that he "most likely" used "ownership" is not particularly availing, especially in light of Stockbridge's unequivocal, and uncontested, statements to the contrary.

Additionally, the court's reliance on Agent Prado's testimony is out of context. The court's decision relies on Agent Prado's use of the following phrase: "the computer [Stanley] jointly owned with Tiana Stockbridge." But the entire statement is part of Agent Prado's declaration about what Stanley admitted and includes *Agent Prado's* characterization of ownership, not Stanley's. The entire statement, in context, reads as follows: "Defendant used the computer he jointly owned with Tiana Stockbridge to view images of child pornography." If one were to read the whole sentence, and not just that isolated phrase, one would discover that the operative declaration there is what Stanley admitted he used the computer for — that is, he confessed to storing child pornography on it — not who owned the computer. By selectively reading the statement out of context, the court fails to realize that the ownership reference is an after-the-fact characterization that Agent Prado inserted himself.

Essentially, the government wants us to believe that Stanley co-owned a computer that his father gave to him, with his

ex-girlfriend who he hadn't lived with for years, and who was currently dating somebody else. The absurdity of this logic would be comical if it were not so tragic for Mr. Stanley and so detrimental to this court's future precedent.

The co-ownership theory isn't just clearly erroneous — it's patently false. Because the record does not support a co-ownership theory of consent, the only way this warrantless search can pass muster under the Fourth Amendment is if Stockbridge had either common authority or apparent authority to consent.

## B.  Common Authority

The court also agrees with the government's assertion that Stockbridge had common authority over the laptop because of her previous joint use while she was living with Stanley, and because Stanley allowed her to hold the laptop while he was in prison. Citing *United States v. Matlock*, 415 U.S. 164, 170 (1974), the court points out that "the consent of one who possesses common authority over premises or effects is valid against the absent, nonconsenting person with whom that authority is shared." The problem, however, is that here the authority *was not* shared. The court's conclusion that Stockbridge, through her most recent possession and limited past joint use, had common authority over the computer is inconsistent with Ninth Circuit precedent.

It is by now axiomatic that possession does not confer "common authority." For example, we have previously held that a girlfriend does not cede authority to her boyfriend to consent to a search of a purse that she left in the trunk of his car. *United States v. Welch*, 4 F.3d 761, 764 (9th Cir. 1993). Similarly, a defendant does not authorize his friend to consent to a search of his boxes simply because that friend agreed to store the defendant's boxes in his garage. *United States v. Fultz*, 146 F.3d 1102, 1105 (9th Cir. 1998); *see also United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000) (same

reasoning and similar facts). And a friend does not have the authority to consent to a search of a prisoner's computer discs simply because that friend was given those discs to hold while the defendant was in prison. *James*, 353 F.3d 606, 614 (8th Cir. 2003). "Put another way, one does not cede dominion over an item to another just by putting him in possession [of it]." *Id.*

The record shows that Stockbridge possessed Stanley's computer — along with his clothing, video games, and other items — only because Stanley was in prison, and they both expected Stanley to re-possess the computer once he got out. This arrangement did not somehow give Stockbridge the right to allow law enforcement to mosey around Stanley's computer files anymore than it gave her the right to allow law enforcement to sift through Stanley's underwear. That Stockbridge possessed the computer does not mean she had common authority over it.

The court also agrees with the government that Stockbridge had common authority through her joint use because she could have accessed Stanley's files at any time. This circuit's precedent and other circuit court decisions, demonstrate that even if a bailee (Stockbridge) can *potentially* access the contents of an item or container (that is, the bailee can break the seal, turn the knob, lift the top, or in this case, click on a user-name), this *potential* access does not mean that the bailee has the *authority* to do so, much less the authority to *consent* for law enforcement to do so. Ninth Circuit cases subsequent to *Matlock* have emphasized that a joint-user with *limited permission* to the searched property lacks common authority to consent to a search. *See, e.g.*, *United States v. Warner*, 843 F.2d 401, 402 (9th Cir. 1988); *United States v. Impink*, 728 F.2d 1228, 1233 (9th Cir. 1984). In those cases where we *have* found that the consent-giver had common authority, we relied on the consent-giver's *unlimited access* to the property to find that the joint-user had common authority to consent to a search. *See, e.g.*, *United States v. Guzman*, 852 F.2d 1117,

1122 (9th Cir. 1988); *United States v. Sealey*, 830 F.2d 1028, 1031 (9th Cir. 1987). Additionally, in those cases where we found that the joint-user had common authority, the consent-giver was a *spouse* who had been *living with* the defendant. Here, we have an ex-girlfriend who hadn't lived with the defendant for years. To meet its burden of showing "common authority," the government needed to introduce evidence beyond simply that Stockbridge had used the computer and that she was once again in possession of it. But that's all the government showed, which isn't enough to establish common authority.

For instance, in *Fultz* the defendant asked his friend to store some boxes in a garage that the friend owned. 146 F.3d at 1105. The government asserted that the friend had actual authority to consent to a search of the defendant's boxes because the friend had "full access to the garage, thereby negating any expectation of privacy that Fultz might have had in his cardboard boxes." *Id.* at 1106. The Ninth Circuit rejected the government's argument, pointing out that the friend did not use the boxes, nor did he claim to have a right to access the boxes. *Id.* Additionally, the court emphasized that the boxes "were segregated in one area of the garage." *Id.* "Thus, [the friend] lacked actual authority to consent to the search." *Id.* at 1106. Similarly, here the government asserts that Stockbridge had authority to consent to a search, even though Stockbridge adamantly denies ever having such authority. Like the friend in *Fultz*, Stockbridge did not use Stanley's files or access them in any way. Like the boxes in *Fultz*, Stanley's files were segregated in one area of the computer — that is, under *his* username. Like the defendant in *Fultz*, Stanley expected Stockbridge to leave his files alone. Yet, without any explanation, the court disregards *Fultz* altogether.

Furthermore, in *United States v. Davis*, the Ninth Circuit concluded that a roommate could not consent to the search of a bag belonging to her roommate's boyfriend, even if the boy-

friend left the bag at the apartment. 332 F.3d 1163, 1169 (9th Cir. 2003). Applying the "container within a container" logic from *Welch* and *Fultz*, we reasoned that the key inquiry was not whether the consent-giving roommate had joint access to the apartment, but whether she had joint access to that particular bag. *Id.* Applied here, the question is not whether Stockbridge simply had joint use of the computer, but whether she had joint use and access to *Stanley's files*. "The shared control of 'host' property does not serve to forfeit the expectation of privacy of *containers within that property*." *Id.* (emphasis added).

Like the apartment in *Davis*, in this case the computer functions as the "host" property; Stanley's username, directories, and files, are the separate containers *within* that property. The computer hard drive is a modern-day "container within a container." Stockbridge could no more consent to a search of these files than the roommate in *Davis* could lawfully consent to the search of the duffle bag. Indeed, an unlocked duffle bag can be just as easily unzipped as an unlocked username can be accessed through the click of a mouse. Yet, if the former is protected, there is little reason not to protect the latter.

Additionally, there is no evidence in the record that Stanley ever gave Stockbridge permission to exercise control over his hard drive, or to consent to a search of the hard drive. Stanley, like all prisoners, had no choice but to allow someone to hold onto his property for him while he served his sentence. When Stockbridge received the computer, Stanley's files were behind a sealed username that she had to "breach." Stanley marked these files confidential by placing them under his username, and by previously password-protecting them, evidencing a desire that no one, including Stockbridge — but especially law enforcement — view the files.

That Stanley allowed Stockbridge to access her music on the computer does not change this calculus: when accessing those files, Stockbridge was acting pursuant to an express

authorization that was narrowly tailored. It strains credulity to expand this limited instruction into an all-purpose license that includes not only full access, but also "common authority." If Stanley had intended to grant Stockbridge common authority over his files, why would he segregate them? Why would he set up a password while living with her? Why would he hide them deep within the computer directories? Every action that Stanley took, from setting up separate usernames to taking the computer with him when he moved out, indicates that he never intended for anyone but him to access his files. Taken together, the totality of the circumstances demonstrates that Stanley did not cede any authority to Stockbridge to view his files, much less consent to a search. I would follow this circuit's guidance in *Fultz*, *Davis*, and *Welch*, and reverse the district court's decision not the suppress this evidence.

For its part, the court cites the Supreme Court's decision in *Matlock*, as well our decisions in *United States v. Ruiz*, 428 F.3d 877 (9th Cir. 2005), and *United States v. Brannan*, 898 F.2d 107 (9th Cir. 1990). However, upon closer inspection, these cases would not support the court's conclusion.

Take *Brannan*, which the court cites for the following proposition: " 'Common authority' rests upon mutual use of the property by those generally having joint access or control such that it is reasonable to recognize that each of the parties has the right to permit inspection and has assumed the risk that the other party might consent to a search." 898 F.2d at 108. But here the court's decision never explains *how* an ex-girlfriend who was serving as a bailee was somehow imbued with the authority to consent to a search of her ex-boyfriend's property, when a *current* girlfriend had no such authority in *Davis*. Or *why* it is "reasonable to recognize" in this instance that a prisoner "assumes the risk" that a bailee will consent to a search, but it was *not reasonable* for the bailee to consent in *Fultz*.

In fact, in *Brannon* the Ninth Circuit concluded that the defendant's wife had actual authority to consent to a search of

a house that she jointly-owned, even though she had recently moved out. 898 F.2d at 108. But the key in *Brannon* was that the consent-giver had authority to consent because she (1) was *married* to the defendant, and (2) actually *owned* the house that was searched (that is, her name was on the title). *Id*. The parallel with this case is nonexistent, because Stanley and Stockbridge were never married, had been broken up for two years, weren't living together, and Stockbridge has no ownership stake in the computer.

With the co-ownership theory void of any factual support, and the common authority theory void of any precedential support, the only remaining way to justify the government's warrantless search is by finding apparent authority.

## C.   Apparent Authority

The court also agrees with the government that the agents were reasonable to conclude that Stockbridge had apparent authority to consent to the computer search, even if Stockbridge was not a co-owner and did not possess common authority. But here, once again, we are reminded that facts are stubborn things.

The test for apparent authority is straight forward: whether the facts available to the agents at the time of the search would lead a reasonable person to conclude that the consenting party had authority over the property. *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (internal citation omitted); *see also Welch*, 4 F.3d at 764 ("Under the apparent authority doctrine, a search is valid if the government proves that the officers who conducted it reasonably believed that the person from whom they obtained consent had the actual authority to grant that consent.").

This, of course, is a fact-based inquiry. Indeed, it's impossible to apply this test without discussing the facts that the agents *knew at the time of the search*. But it's hard to tell how

the court concludes that Stockbridge had apparent authority because it chooses not to "revisit [the facts] at this juncture."

So what is it that the agents knew at the time of consent? For starters, the agents knew that Stockbridge had once dated Stanley, but that the couple had broken up and had not lived together for *two* years. The agents also knew that Stockbridge was currently dating *someone else* at the time (David Trimm, the man who tipped off law enforcement about the files in the first place). The agents knew that Stockbridge was holding the computer while Stanley was in prison. The agents also knew that there was reason to suspect that Stanley's files contained illicit photographs. And finally, the agents knew that the computer had two separate usernames, one for Stanley and another for Stockbridge.

There is no way that any reasonable person would believe that, under these circumstances, Stockbridge had the authority to consent to a search of Stanley's property. How is it reasonable to conclude that an ex-girlfriend has authority to consent to a search of her ex-boyfriend's computer while he is in prison and while she is dating someone else? It's not. And, of course, that is why the agents sought a search warrant in the first place.

What's more, the officers knew too much about Stanley's manifested desire to keep others out of his files, and about his ownership of the computer. That is, they knew that the files were hidden, that the files were saved under Stanley's username, and that Stanley had taken the computer with him when he moved to California. *See Davis*, 332 F.3d at 1170 (noting that "the officers were aware" that the defendant's items "were in a specific area separate from" everything else); *Fultz*, 146 F.3d at 1106 (noting that officers were aware that the defendant's boxes were segregated into a separate area of the garage); *James*, 353 F.3d at 614 (noting that the officers knew the defendant had placed his discs in separate envelopes

that would have to be opened, thereby undermining the government's apparent authority claim).

The court also agrees with the government's argument that it was objectively reasonable to conclude that Stockbridge had apparent authority because she *possessed* the computer. But this is a misapplication of the law because possession, in itself, does not translate to authority. Recall that in *Welch* the boyfriend could not consent to a search of his girlfriend's purse, even though he possessed it in his car. 4 F.3d at 764. And in *Fultz* a friend could not consent to a search of a defendant's boxes even though the friend possessed the boxes. 146 F.3d at 1105. "An officer's mistaken belief as to the law, even if reasonable, cannot establish apparent authority." *Davis*, 332 F.3d at 1170 (citing *Welch*, 4 F.3d at 764-65). By accepting the government's apparent authority argument, the court is rubberstamping the government's errors and ignoring key precedents.

In its decision, the court also apparently agrees with the government's argument that because Stanley's files were not password protected (thereby giving Stockbridge potential access to his files), the agents were reasonable to conclude that Stockbridge had authority to consent. But this, too, is a misapplication of the law. Recall that in *Fultz* the defendant's friend had potential access to the defendant's boxes, which were unlocked and sitting in the friend's garage. We concluded in *Fultz* that this potential access did not confer authority to consent. 146 F.3d at 1105. Again, conclusions are not "reasonable" if they are based on misapplications of the law. *Davis*, 332 F.3d at 1170.

Additionally, the court's reliance on the Fourth Circuit's decision in *United States v. Buckner*, 473 F.3d 551 (4th Cir. 2007), is misplaced. In *Buckner* the defendant's wife consented to a search of her husband's computer files that were stored on a computer that was leased in her name. *Id*. at 555. Because the files were password-protected, the court con-

cluded that she did *not* have authority to consent to the search. *Id*. at 554. The court reasoned that the password protection indicated the defendant's intent to exclude others from his files. *Id*. However, the court concluded that the wife had *apparent authority* to consent based on the information the officers knew at the time, namely,

> that the computer was located in a common living area of the Buckners' marital home, [the officers] observed that the computer was on and the screen lit despite the fact that Frank Buckner was not present, and [the officers] had been told that fraudulent activity had been conducted from that computer using accounts opened in [the wife's] name. The officers also knew that the machine was leased solely in [the wife's] name and that she had the ability to return the computer to the rental agency at any time, without Frank Buckner's knowledge or consent.

*Id*. at 555. None of these facts finds any parallel in the present case. If anything, the reasoning in *Buckner* counsels against apparent authority. Unlike the couple in *Buckner*, Stanley and Stockbridge were not living together or even dating one another at the time of the search. Unlike the computer in *Buckner*, which was leased in the wife's name, the computer here belonged solely to Stanley.

Given what the agents knew at the time of the search, it cannot be said that they acted pursuant to a reasonable belief that Stockbridge had authority to consent to the warrantless search.

## II

### Password Protection

Alternatively, the court insists that because Stanley's files were not password protected when Stockbridge took the com-

puter, Stanley had no reasonable expectation of privacy. But this myopic focus on whether Stanley's files were password protected ignores key facts.

First, Stanley's username *was* password protected while he was living with Stockbridge. Only when Stanley *stopped living* with Stockbridge, and began using his computer by himself, did he remove the password. In other words, Stanley took precautions to protect his files when he knew that others would have easy access to them.

Second, the computer did not have a password when Stockbridge took control of it because Stanley was behind bars. Stanley did not have the opportunity to reinstall a password because he did not anticipate the arrest. Prisoners are not allowed furloughs for the sole purpose of reinstalling a password on their computers before turning it over to a custodian. Therefore, Stanley's failure to install the password does not speak to whether he had an expectation of privacy.

And third, the court's reasoning would necessarily mean that no prisoner would have any reasonable expectation of privacy in his personal effects the second he enters the jailhouse — unless that property happens to be stored in a locked container. Under this interpretation of the Fourth Amendment, a police dragnet could extend to whatever property a prisoner did not place under lock and key before he entered his jail cell. Of course, because most prisoners rarely place their property into storage in anticipation of arrest, this dragnet would functionally include everything a defendant might own. As a matter of policy, this argument is troubling; as a matter of law, it is without support. The court certainly cites no law or case (from any court) to support this sweeping circumvention of the Fourth Amendment.

The court does cite the Fourth Circuit's decision in *Trulock v. Freeh*, 275 F.3d 391 (4th Cir. 2001), and indeed that case is instructive. In *Trulock* the Fourth Circuit considered

whether one joint-user of a computer can consent to a warrantless search of another's password-protected files. *Id.* at 403. The *Trulock* court concluded that the joint-user's authority did *not* extend to the password protected files because by installing a password the defendant had "affirmatively intended to exclude [the joint-user] and others from his personal files." *Id.* That reasoning is crucial because here Stanley demonstrated his intention to exclude Stockbridge from his files when he password protected them *while living with her*. He had no reason to keep that password after he moved out because at that point he was the only user. But that previous intention to exclude others, such as Stockbridge, never went away. Stanley's files were *always* segregated under his login name. Password or not, Stanley considered those files his, and that section of the computer closed off. The mechanical focus on whether the computer had a password at the very moment when Stockbridge took the computer strips *Trulock* of its logical moorings. To the extent that password-protected files are more constitutionally private than non-password-protected files, the key fact is that Stanley *did* secure his directories while he was living with Stockbridge. The court's formalism misses the forest for the trees.

Additionally, the Supreme Court does not make distinctions between locked and unlocked containers when it comes to expectations of privacy. In *Robbins v. California*, the Supreme Court considered whether police officers who are conducting a lawful, but warrantless, search of a vehicle during a traffic stop, may also search an unlocked container found within that car. 453 U.S. 420, 425 (1981). In his plurality opinion, Justice Stewart flatly rejected the argument that there is a constitutional distinction between containers that are more "secured" than others.

> First, it has no basis in the language or meaning of the Fourth Amendment. . . . The contents of Chadwick's footlocker and Sanders' suitcase were immune from a warrantless search because they had

been placed within a closed, opaque container and because Chadwick and Sanders had thereby reasonably "manifested an expectation that the contents would remain free from public examination." Once placed within such a container, a diary and a dishpan are equally protected by the Fourth Amendment.

Second, even if one wished to import such a distinction into the Fourth Amendment, it is difficult if not impossible to perceive any objective criteria by which that task might be accomplished. What one person may put into a suitcase, another may put into a paper bag. And as the disparate results in the decided cases indicate, no court, no constable, no citizen, can sensibly be asked to distinguish the relative "privacy interests" in a closed suitcase, briefcase, portfolio, duffel bag, or box.

*Id.* at 426-27 (internal citations omitted). The Supreme Court reiterated this conclusion in *United States v. Ross*, and clarified that the scope of the *Robbins* rule is broad:

This rule applies equally to *all containers*. One point on which the Court was in virtually unanimous agreement in *Robbins* was that a constitutional distinction between "worthy" and "unworthy" containers would be improper. Even though such a distinction perhaps could evolve in a series of cases in which paper bags, locked trunks, lunch buckets, and orange crates were placed on one side of the line or the other, the central purpose of the Fourth Amendment *forecloses such a distinction*. For just as the most frail cottage in the kingdom is absolutely entitled to the same guarantees of privacy as the most majestic mansion, so also may a traveler who carries a toothbrush and a few articles of clothing in a paper bag or knotted scarf claim an equal right to conceal his possessions from official inspection as

> the sophisticated executive with the *locked* attaché case.

456 U.S. 798, 822 (1982) (emphasis added). A frail cottage might not have the padlock that a majestic mansion has, but under the Fourth Amendment, that does not matter. Justice Stewart's logic, which applies as equally to locked suitcases as it does to paper bags (which cannot be "locked" in any meaningful way), should be applied to our modern-day containers, such as computer directories. If an individual can maintain a reasonable expectation of privacy in an unlocked paper bag that's stuffed with a toothbrush, then likewise he can maintain a reasonable expectation of privacy in his unlocked computer.

Constitutional protections do not turn on the frailty of a container's securities because the Fourth Amendment does not concern itself with passwords or locks. *See Miller v. United States*, 357 U.S. 301, 307 n.7 (1958) (quoting William Pitt's speech to Parliament in 1763, " 'The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter-all his force dares not cross the threshold of the ruined tenement.' ") (citing THE OXFORD DICTIONARY OF QUOTATIONS 379 (2d ed. 1953)).

Ultimately, the court's laser-like focus on whether the computer was password protected is much ado about nothing.

### III

### Clearly Erroneous

The court argues that I overlook a difference between our role as an appellate court, and the district court's role as the fact finder. The court is quite right that we review the district court's factual findings for "clear error." Indeed, I apply this

standard and conclude that the district court's conclusion that Stockbridge was a co-owner of the computer was clearly erroneous. An ex-girlfriend does not co-own a computer given to her ex-boyfriend by his father.

But the issue of consent is not a factual question; it is a legal question. This entire dissent is predicated on the assumption that Stockbridge *did* consent to the search — thereby *deferring* to the district court's conclusion. The issue is not whether Stockbridge consented, the issue is whether *she had the authority to consent*. That is a legal question that we review *de novo*. The court's argument is predicated on the assumption that this is a factual issue, which misses the point. Upon review, I conclude that as a matter of law, an ex-girlfriend, acting as a bailee, cannot consent to a search of her ex-boyfriend's property while he is serving a prison sentence. Additionally, the "apparent authority" question is also a *legal issue*, even though it involves a fact-based inquiry. Again, as a matter of law, I conclude that based on this court's precedent and Supreme Court precedent, given what the agents knew at the time, it was unreasonable for them to believe that an ex-girlfriend had the authority to consent to this search. Indeed, as stated above, the agents' conclusion that Stockbridge had apparent authority was based on two misapplications of the law — which can never be reasonable.

## Conclusion

After law enforcement agents took possession of Stanley's computer, they sought and received a search warrant that allowed them to search the laptop's files. But warrants are not diamonds; they are not forever.

By failing to renew the search warrant, the government had no choice but to rely on an alternative justification: consent. But this after-the-fact justification cannot be squared with the facts, much less the Constitution. I, for one, do not believe that the Fourth Amendment can be so easily ignored or cir-

cumvented. Warrantless searches are not trivial events. Serious events ought to be taken seriously.

An ex-girlfriend has no authority to consent to a search of her ex-boyfriend's computer while he is in prison. Under the cardinal principle embedded in the Fourth Amendment, this warrantless search was illegal. I would reverse the district court's decision not to grant Stanley's Motion to Suppress.

I dissent.