REVISED - JUNE 22, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-50444
_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                    versus

ELWOOD CLUCK, also known as
Jack Cluck,

                                        Defendant-Appellant.

_____

Appeal from the United States District Court for the
Western District of Texas
_____

June 3, 1998

Before WISDOM, JOLLY, and HIGGINBOTHAM, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

    Elwood "Jack" Cluck appeals his conviction and sentence for committing bankruptcy fraud in violation of 18 U.S.C. § 152(1) & (3). Finding no merit in any of Cluck's multitudinous and niggling points of error, we affirm.

I

A

    Before the events in this case, Cluck was an attorney who specialized, by his own admission, in the legal avoidance of

income, estate, and gift taxes.[1]  His practice was, by all accounts, quite successful, allowing Cluck to enjoy many of the finer things in life.  In his case, the finer things ranged from an assortment of properties located throughout the state of Texas, to his own Beechcraft Bonanza airplane, to a collection of classic Jaguar automobiles.

Smooth travel sometimes comes to an abrupt halt, however, and so it was in the case of Cluck.  In October 1989, the road ahead worsened considerably when a state court rendered judgment against him in the staggering amount of $2.9 million.[2]  Although Cluck had high hopes that an appellate detour would shortly return him to his golden highway,[3] he soon found that the detour itself would require

---

[1]An undoubtedly satisfying profession that we do not disparage.  See Estate of McLendon v. Commissioner of Internal Revenue, 135 F.3d 1017, 1025 n.16 (5th Cir. 1998).

[2]The suit was based on alleged fraudulent conduct by Cluck in his handling of the estate of Booney M. Moore, one of his tax planning clients.  It was brought pursuant to Texas's Deceptive Trade Practices Act, whose punitive damage provisions gave rise to the large award.  For further background, see generally Coble Wall Trust Co. v. Palmer, 848 S.W.2d 696 (Tex. App.–San Antonio 1991, writ granted), rev'd and remanded, 851 S.W.2d 178 (Tex. 1992), on remand, 859 S.W.2d 475 (Tex. App.–San Antonio 1993, writ denied).

[3]As well he should have.  The judgment entered on the jury's verdict was reversed on appeal for lack of subject matter jurisdiction in the trial court.  See Coble Wall Trust Co. v. Palmer, 848 S.W.2d 696 (Tex. App.–San Antonio 1991, writ granted).  Although that decision was itself reversed by the Texas Supreme Court, see Palmer v. Coble Wall Trust Co., 851 S.W.2d 178 (Tex. 1992), on remand the appellate court found a further reason to reverse the verdict that was apparently less offensive.  See Coble

a steep toll of 10 percent in the form of the supersedeas bond necessary to forestall execution.  Short of funds and in need of a cul de sac in which to safely park his troubled vehicle for a while, Cluck turned to the refuge of the bankruptcy court, as many a similarly threatened sojourner had done before him.

Unlike these other voyagers, however, Cluck apparently concluded that his resources would need more protection than the bankruptcy court could provide until his appellate travels had reached their final destination.  Thus, before invoking the power of Title 11, he perceived that it might be useful to keep some Jaguars in reserve, some money within easy access, and, maybe, just for good measure, a few of his favorite things beyond the reach of his creditors and the bankruptcy court.  To this end, on March 26, 1990, Cluck returned a note for $50,000 to its grantor, Perfect Union Lodge.  Perfect Union was one of Cluck's clients, and the note had been originally tendered in payment of certain legal services.  Three days later, on March 29, Cluck pawned three Jaguars, a 1983 Chevrolet truck, his airplane, a Lone Star boat, and a Winnebago camper shell ("the Jaguars, etc.") to a used car

---

Wall Trust Co. v. Palmer, 859 S.W.2d 475 (Tex. App.-San Antonio 1993, writ denied) (acknowledging subject matter jurisdiction, but finding suit nonetheless barred by res judicata and for other reasons).

dealer for $32,000,[4] retaining for himself and his designee a right to reacquire at a set price[5] within thirty to ninety days of the sale.

B

His affairs now in preliminary order, on March 30, Cluck filed his petition for Chapter 7 liquidation in the United States Bankruptcy Court for the Western District of Texas. As part of the standard Chapter 7 procedure, Cluck was required to file a Schedule of Assets and a Statement of Financial Affairs. These documents required, among other things, disclosure of all accounts receivable, rights of acquisition, and asset transfers during the prior year. On his forms, Cluck made no mention of the assets recently pawned to the used car dealer or of his right to reacquire. He also did not disclose his return of the $50,000 note or the corresponding account receivable from Perfect Union Lodge. In addition, Cluck failed to list a transfer of 351 acres of land in McMullen County, Texas, that he had made on June 21, 1989. Finally, and significantly for this appeal, Cluck also neglected to include a further $150,000 in pre-petition accounts receivable from another of his clients, the O.D. Dooley Estate.

_____

[4]A price that was, needless to say, significantly below the assets' fair market value.

[5]About $38,000.

4

On July 31, Cluck's bankruptcy came to its first purported close, and the bankruptcy court entered an order discharging him from all dischargeable debts. Thinking his plan to have succeeded, on November 9, Cluck collected $48,000 from the O.D. Dooley Estate in partial payment of that client's aforementioned pre-petition account receivable. On November 16, the remaining $102,000 followed. About seven months later, on June 28, 1991, Cluck collected $35,000 from Perfect Union in settlement of its still-outstanding $50,000 account receivable. Of these funds, a portion was deposited into the account of First Capitol Mortgage, a Nevada corporation owned by Cluck's wife, Kristine. By this time, First Capitol had also reacquired all of the assets that had been pawned to the used car dealer. As might be suspected, neither the receipt of the money nor the reacquisition of the assets was revealed to the bankruptcy trustee.

As the dog days of summer 1991 wore on, the bankruptcy trustee finally got scent of Cluck's machinations. After gathering his evidence, on October 9, the trustee initiated an adversary proceeding against Cluck, his wife, First Capitol Mortgage, and the used car dealer, all pursuant to 11 U.S.C. § 548, alleging fraudulent concealment of assets and requesting that Cluck's discharge be revoked. After a one-day trial, the bankruptcy court agreed, finding that Cluck had engaged in the pattern of fraudulent

5

concealment and deception outlined above, and that First Capitol Mortgage was his alter ego.  The court revoked Cluck's discharge, and, on December 31, 1992, ordered him: (1) to turn over to the trustee the assets that had been pawned to the used car dealer; (2) to pay $195,000[6] to the trustee for the concealed accounts receivable; and (3) to pay an additional $13,000 to the trustee for a fourth Jaguar automobile that had been otherwise concealed and could no longer be located.

II

The bankruptcy court's finding of intentional concealment apparently aroused the interest of the U.S. Attorney, and on March 27, 1995, Cluck was charged with eight counts of bankruptcy fraud in violation of 18 U.S.C. § 152(1) & (3).  The counts were essentially as follows:

Count One:     Making a false statement in violation of § 152(3) for failing to include the Perfect Union and O.D. Dooley accounts receivable on his Statement of Financial Affairs.

Count Two:     Fraudulent concealment in violation of § 152(1) for failing to reveal the return of the $50,000 Perfect Union note, the sale of 351 acres of land in McMullen County, Texas, and the pawning of the Jaguars, etc., all of which were

_____

[6]It is unclear from the record before us why this sum was $195,000, and not $185,000, as the simple addition of the O.D. Dooley and Perfect Union (settlement) figures would suggest.

transfers that occurred within one year of his bankruptcy petition.

Count Three:   Fraudulent concealment in violation of § 152(1) for failing to reveal his post-petition receipt of the $35,000 payment from Perfect Union Lodge on a pre-petition account receivable.

Count Four:    Making a false statement in violation of § 152(3) for failing to include the return of the $50,000 Perfect Union note, the sale of 351 acres of land in McMullen County, Texas, and the pawning of the Jaguars, etc., on his Statement of Financial Affairs.

Count Five:    Fraudulent concealment in violation of § 152(1) for failing to reveal his post-petition receipt of the $102,000 payment from the O.D. Dooley Estate on a pre-petition account receivable.

Count Six:     Fraudulent concealment in violation of § 152(1) for failing to reveal his post-petition receipt of the $48,000 payment from the O.D. Dooley Estate on a pre-petition account receivable.

Count Seven:   Fraudulent concealment in violation of § 152(1) for failing to reveal his right to reacquire the Jaguars, etc.

Count Eight:   Making a false statement in violation of § 152(3) for failing to include his right to reacquire the Jaguars, etc. on his Statement of Financial Affairs.

On January 16, 1997, a jury found Cluck guilty on counts one, three, four, five, six, seven, and eight, and not guilty on count two. On May 22, 1997, Cluck was sentenced to concurrent terms of twenty-four months imprisonment on each count, and ordered to pay

7

restitution in the amount of $185,000. Cluck appeals his conviction, sentence, and restitution order on multiple grounds.

III

Cluck makes four distinct arguments on appeal, none of which has merit.

A

First, Cluck argues that his original indictment was insufficient for purposes of the Sixth Amendment in that it did not specifically allege that the property concealed was property of the bankruptcy estate, or that the concealment and false statements arose in connection with a case under Title 11, both of which he contends are essential elements of § 152(1) and/or (3).

We review the sufficiency of an indictment de novo. United States v. Asibor, 109 F.3d 1023, 1037 (5th Cir. 1997). "To be sufficient, an indictment needs only to allege each essential element of the offense charged so as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding." United States v. Webb, 747 F.2d 278, 284 (5th Cir. 1984). The test of the validity of an indictment is "not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards." Id. Under this liberal review, we look to a practical, non-technical reading of the indictment as

8

a whole, and an indictment will be held sufficient unless "no reasonable construction of the indictment would charge the offense for which the defendant has been convicted." McKay v. Collins, 12 F.3d 66, 69 (5th Cir. 1994).

With respect to Cluck's first complaint, we note that § 152(1) only requires that the property concealed "belong[] to the estate of the debtor," not to the "bankruptcy estate." Cf. United States v. Arge, 418 F.2d 721, 724 (10th Cir. 1969) (referencing "bankruptcy estate" under a prior version of the statute). Unsurprisingly, our review of the indictment's language indicates that it was more than sufficient to put Cluck on notice that he was being charged with concealing his own property. There is therefore no merit to his argument on this point.

With respect to Cluck's second complaint, it is true that the relevant portions of § 152(1) & (3) require that the concealment or false statement be made "in connection with a case under title 11," or "in or in relation to a[] case under title 11," respectively. Our review of the indictment reveals, however, that it clearly indicated that all charges arose in connection with Cluck's specifically named and cited bankruptcy proceeding. Obviously, this reference was more than sufficient to put Cluck on notice that he was being charged with concealment "in connection with a case

9

under title 11," and making false statements "in or in relation to a[] case under title 11," so there is no merit here either.

B

Cluck next contends that he was subjected to a multiplicitous indictment in that he was charged for the same conduct under both § 152(1) & (3) in counts one and two, three and four, and seven and eight, and, second, in that counts five and six both referenced payment on a single account receivable. The first part of Cluck's argument appears to be a matter of first impression in this circuit.

We review issues of multiplicity de novo. United States v. Dupre, 117 F.3d 810, 818 (5th Cir. 1997). In general, "multiplicity" is the charging of a single offense under more than one count of an indictment. United States v. Nguyen, 28 F.3d 477, 482 (5th Cir. 1994). "The chief danger raised by a multiplicitous indictment is the possibility that the defendant will receive more than one sentence for a single offense." United States v. Swaim, 757 F.2d 1530, 1537 (5th Cir. 1985). Where the question of multiplicity arises because of overlapping statutory provisions, "[t]he test for determining whether the same act or transaction constitutes two offenses or only one is whether conviction under each statutory provision requires proof of an additional fact which the other does not." Nguyen, 28 F.3d at 482 (citing United States

10

v. Free, 574 F.2d 1221, 1224 (5th Cir. 1978)); see also Dupre, 117 F.3d at 818 (citing Blockburger v. United States, 284 U.S. 299, 304 (1932)). Where, on the other hand, the question of multiplicity arises because of a multipart transaction, the question becomes "'whether separate and distinct prohibited acts, made punishable by law, have been committed.'" United States v. Shaid, 730 F.2d 225, 231 (5th Cir. 1984) (quoting Bins v. United States, 331 F.2d 390, 393 (5th Cir. 1964)). In the bankruptcy fraud context, "[m]ultiple violations of § 152 occur, and multiple indictments lie, when each fraudulent transfer is a 'separate act, taken at a discrete time, with the requisite intent.'" United States v. McClennan, 868 F.2d 210, 213 (7th Cir. 1989) (quoting United States v. Moss, 562 F.2d 155, 160 (2d Cir. 1977)).

With respect to Cluck's first complaint, there can be no doubt that charging the same conduct under both § 152(1) & (3) does not render an indictment multiplicitous. By its very terms, § 152(1) requires that property be concealed "from creditors or the United States Trustee" before a violation occurs. Section 152(3) incorporates no such element. Correspondingly, § 152(3) requires that the accused make a "false declaration, certificate, verification or statement under penalty of perjury" before liability attaches, whereas § 152(1) contains no such prerequisite. Because each statutory provision "requires proof of an additional

11

fact which the other does not," charging the same conduct under both sections does not give rise to a multiplicity problem.[7]

Cluck's second complaint is similarly lacking in merit. Counts five and six charged concealment based on Cluck's pocketing of two payments from the O.D. Dooley Estate. Our review of the record reveals no dispute that two checks, one in the amount of $102,000 and one for $48,000, were received and deposited on two separate occasions separated by some seven days. These separate acts, taken at discrete times, implicated two distinct opportunities for Cluck to formulate and effect his criminal intent. Because counts five and six were predicated on these distinct prohibited acts, they were not duplicitous.

C

Cluck next attempts to persuade us that the evidence was insufficient on all the counts of his indictment with respect to

---

[7]We note in passing that our decision on the multiplicity of a combined § 152(1) & (3) indictment appears to conflict with that of the only other circuit to have expressly considered the matter. See United States v. Montilla Ambrosiani, 610 F.2d 65, 69 (1st Cir. 1979). With regard to the larger multiplicity question of charging a single act under more than one of the many subsections of § 152, however, we note relatively mixed authorities tending in both directions. Compare, e.g., United States v. Gordon, 379 F.2d 788, 790 (2d Cir. 1967), and United States v. Shireson, 116 F.2d 881, 884 (3d Cir. 1940) (no multiplicity problem), with United States v. McIntosh, 124 F.3d 1330, 1336-37 (10th Cir. 1997), and Montilla Ambrosiani (tending to find a problem), and with United States v. Christner, 66 F.3d 922, 926-30 (8th Cir. 1995) (ambivalent). See also United States v. UCO Oil Co., 546 F.2d 833, 835-38 (9th Cir. 1976) (finding a multiplicity problem in a similar context).

12

intent. Under § 152(1) & (3), the prosecution must show that the concealment or false statement was made "knowingly and fraudulently." Cluck argues, essentially, that the evidence showed only that he was careless in providing information to his bankruptcy attorney, not that he committed intentional fraud.

In assessing sufficiency, we review the evidence in the light most favorable to the jury verdict. United States v. Willey, 57 F.3d 1374, 1380 (5th Cir. 1995). All credibility determinations and reasonable inferences will be resolved in favor of the verdict, and the evidence will be found sufficient unless it was not such as could lead a rational fact-finder to conclude that the essential elements of the crime had been proved beyond a reasonable doubt. Nguyen, 28 F.3d at 480.

In applying this requirement, "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." United States v. Bell, 678 F.2d 547, 549 (5th Cir. 1982) (en banc), aff'd on other grounds, 462 U.S. 356 (1983). In particular, the court must keep firmly in mind that "what the fact finder 'is permitted to infer from the evidence in a particular case is governed by a rule of reason.'" United States v. Henry, 849 F.2d 1534, 1537 (5th Cir. 1988) (quoting United States v. Cruz-Valdez, 773 F.2d 1541, 1546 (11th Cir. 1985) (en banc)). Fact-finders may

13

properly "'use their common sense'" and "'evaluate the facts in light of their common knowledge of the natural tendencies and inclinations of human beings.'" Id. Furthermore, it is well established that "'[c]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof.'" United States v. Ayala, 887 F.2d 62, 67 (5th Cir. 1989) (quoting The Slavers (Reindeer), 69 U.S. (2 Wall.) 383, 401 (1865)).

In this case, it is manifestly clear that Cluck's repeated omissions and history of coincidental and questionable transfers formed just the sort of "circumstances" that the Supreme Court had in mind in the Reindeer case. Based on our review of the record, we are convinced that a rational jury could have inferred the existence of an intentional plan to defraud from the bare facts of Cluck's systematic concealment and false statements. We therefore find no merit to his argument that the evidence was insufficient on this point.

D

Finally, Cluck pleads that, even if his conviction is allowed to stand, his sentence and restitution order must be revisited because the district court clearly erred in its calculation of the loss caused by his conduct. He argues, essentially, that the

14

district court did not properly give him credit for the fact that several concealed assets, including those pawned to the used car dealer, had already been recovered by the trustee.

We give considerable deference to a district court's factual findings at sentencing, and will reverse only if they are clearly erroneous.  United States v. Krenning, 93 F.3d 1257, 1269 (5th Cir. 1996).  A factual finding is not clearly erroneous as long as it is plausible in the light of the record read as a whole.  Id.  In this case, a close reading of the record reveals that the district court based both Cluck's sentence and his restitution order on a finding that his conduct caused an actual loss of $185,000 to the bankruptcy trustee.  Cf. United States v. Saacks, 131 F.3d 540, 543 (5th Cir. 1997) ("victims," for purposes of bankruptcy fraud, includes both creditors and the trustee).  This finding, in turn, was predicated solely on the $185,000[8] in concealed accounts receivable.  Because the concealment of these funds was certainly a loss to the bankruptcy trustee, and because Cluck points us towards no evidence that they had been otherwise recovered, we can find no clear error in the district court's calculation.[9]

---

[8]Valuing the Perfect Union account, again, at its $35,000 settlement value.

[9]We do note, however, that the $185,000 restitution order is somewhat duplicitous with the bankruptcy court's civil judgment of December 31, 1992.  Both orders are predicated, at least in part, on the $185,000 in concealed accounts receivable for Perfect Union

15

## VI

Having found no merit in any of Cluck's numerous points of error, for the foregoing reasons, the judgment of the district court is

A F F I R M E D.

---

Lodge and the O.D. Dooley Estate, and both require Cluck to turn over these funds to the bankruptcy trustee.  Obviously, the trustee may not recover on both orders.  Because Cluck had not (and has not, for that matter) shown that he actually paid any portion of the 1992 order, there was no reason for the district court to take that order into account at the time it calculated his restitution. See United States v. Sheinbaum, 136 F.3d 443, 449-50 (5th Cir. 1998) (district court must reduce restitution order by any amount that defendant can show was received by victim as part of a civil settlement).  For future reference, however, we note that the restitution order must be construed as no more than an additional enforcement mechanism for $185,000 of the 1992 judgment, and not as an independent and additional obligation. Cf. United States v. Landay, 513 F.2d 306, 308 (5th Cir. 1975) (describing a similar arrangement).  Any payment that Cluck makes on the 1992 order must be credited towards fulfillment of his restitution obligation, and vice versa.