# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 15, 2011

No. 10-31128

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BRIAN SCOTT SPURLIN; DEBRA FOGLEMAN SPURLIN,

Defendants-Appellants.

Appeals from the United States District Court
for the Western District of Louisiana

Before SMITH, BARKSDALE, and BENAVIDES, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Brian and Debra Spurlin were convicted of concealment of bankruptcy estate assets, 18 U.S.C. §152(1), for knowingly and fraudulently withholding their interests in certain properties from their bankruptcy filings, and false oaths and statements in bankruptcy, 18 U.S.C. §152(3), for a false answer they gave on a bankruptcy questionnaire. Mr. Spurlin was also convicted of bank-

No. 10-31128

ruptcy fraud, 18 U.S.C. §157(1), for filing for bankruptcy to effect and conceal a fraudulent scheme whereby he took money he was supposedly holding in escrow for a company with whom he was doing business.

Mr. Spurlin does not appeal his conviction of concealment, but the Spurlins appeal all other convictions. Because there was insufficient evidence to convict Mr. Spurlin of false oaths and statements in bankruptcy, we reverse that conviction but affirm the remainder of the judgment as to him and vacate the sentence and remand for resentencing in light of the partial reversal. We affirm as to Mrs. Spurlin.

## I.

On September 5, 2005, Mr. and Mrs. Spurlin filed a joint petition for bankruptcy, claiming assets of $3,364 that included only one company, Spurlin and Associates, Inc., formed by the Spurlins with Mr. Spurlin as general manager. That company declared bankruptcy the next day, because it owed a large debt to a client. Despite not listing them on their bankruptcy forms, the Spurlins were involved with several other companies and held other assets.

Golden Athletics, LLC ("Golden Athletics"), held title to the three cars that the Spurlins drove: a 2002 H2 Hummer, a 2002 Cadillac Escalade ESV, and a 2001 Mercedes. Additionally, Mrs. Spurlin sold the Tennyson Oaks Property to Golden Athletics, which then gave it to Mr. Spurlin, who sold it to Golden Choice Financial ("Golden Choice"), another company the Spurlins had created and that continued to own the property while the Spurlins lived there. Mr. Spurlin then sold Golden Choice to Yvonne Fogleman, Mrs. Spurlin's elderly mother, and sold the Tennyson Oaks Property for the company. Another relevant company was International Oil, Gas, and Mineral Management, Inc. ("International Oil"), an oil brokerage firm. Mr. Spurlin wrote multiple checks from that company to Mrs. Spurlin, which were then deposited into their undisclosed joint accounts.

2

No. 10-31128

The Spurlins disclosed only one checking account, with Peoples State Bank, containing $157, even though they had additional accounts.

Though the Spurlins did not claim ownership of any cars or properties, they did claim a debt from James Hill for funds he allegedly had embezzled. The major debt listed on the bankruptcy petition was $705,000 owed to South Michigan Avenue, LLC ("SMA"), a company with which Mr. Spurlin had had a business relationship. Mr. Spurlin contracted to help SMA obtain $200 million in financing for real estate development in Chicago. SMA gave Mr. Spurlin money to hold in escrow, because Mr. Spurlin said potential funding sources needed to see that SMA had capital and equity in the project.

Mr. Spurlin never obtained the financing, and when SMA demanded the money back, he told SMA it had been transferred to Hill, his corporate attorney. SMA representatives never spoke to Hill; they traveled to Dallas but could not find his office. During that trip, Spurlin called them and said he knew they were there and that they should come see him, which they did. Two days after that trip, Spurlin told SMA that he had secured the funds, but before he could realize them, Hill had died. Spurlin claimed Hill had also taken $125,000 from Spurlin, but died without insurance, so the money could not be found, and suing the estate was too expensive.

Mr. Spurlin met with attorney Laramie Henry to prepare for filing joint bankruptcy with Mrs. Spurlin. Mrs. Spurlin never came to the office, but Mr. Spurlin presented Henry with a power of attorney executed between the spouses. Henry did not remember Mrs. Spurlin's ever supplying information directly to him or his staff or specifically talking to her on the phone. He testified that it was his policy to call potential bankruptcy debtors when presented with a power of attorney to make sure they knew about and agreed with what their spouse was doing.

On November 8, 2005, Mr. and Mrs. Spurlin attended a section 341 credi-

tors' meeting, at which the trustee required them to complete an individual questionnaire. That form, prepared by the trustee, said it was completed under penalty of perjury. The form asked whether the debtors' parents were living or dead, and if dead, whether they had left any property. It also reminded debtors that any inheritance within the next six months must be reported. Both Mr. and Mrs. Spurlin signed that form; their answers acknowledged that Mrs. Spurlin's father, Cade Fogleman, had died, but the form indicated he had left no property.

To the contrary, however, Fogleman did leave property, just not to the Spurlins. Mr. and Mrs. Fogleman bought the Mohon Property jointly in 2000 before Mr. Fogleman died, although the closing agent from the sale testified that there may have been intrafamily transactions. The property was listed as Fogleman's address at his death. Mrs. Spurlin also testified that her father had given the Mohon Property to her mother in his will. The Mohon Property was eventually sold by Mr. Spurlin on behalf of Mrs. Fogleman for $149,000, leaving $57,697.59 after the mortgage was satisfied. Mrs. Spurlin did not sign any documents relating to that sale.

Mrs. Fogleman also owned another asset—the Elliot Street Property. Mr. Spurlin sold it on her behalf in September 2005 for $47,000, resulting in a $756.59 profit. The government's witness could not remember whether the Elliot Street Property was listed in the succession when Mr. Fogleman died, and Mrs. Spurlin insisted it was not owned by her parents at her father's death.

At the creditors' meeting, the Spurlins were informed that in joint debtor filings, an answer given by one joint debtor is assumed to be given for both unless the other person objects. Mr. Spurlin did most of the talking. The trustee asked whether they had read the bankruptcy information sheet, petition, and schedules and whether everything was true, correct, and included all their assets. All those questions were answered in the affirmative; if either party had said "no" to the mandatory questions, the trustee would have stopped the

No. 10-31128

proceeding.

But many assets were not in the filings.  At the time, the Spurlins were living in the Tennyson Oaks Property, which was initially purchased by Mrs. Spurlin for $229,167.  She sold it to Golden Athletics for $38,167, which distributed the house to Mr. Spurlin, who sold it to Golden Choice for $200,000 after taking out a $200,000 loan on the property.  Golden Choice was sold to Mrs. Fogleman for $125,000, and the property was then sold for $330,000, most of which went to pay off the loan.  Both Mr. and Mrs. Spurlin signed the act-of-cash-sale agreement for the property on October 5, 2005.  The proceeds from the sale of the Tennyson Oaks Property were split between paying off a loan at Red River Bank for Golden Athletics, a check to Hilltop Productions, LLC, a check payable to the Spurlin children's school, and a check to International Oil.  The Spurlins also drove three cars titled to Golden Athletics, over which they had exclusive use and control.

Finally, although the Spurlins disclosed only their bank account at Peoples State Bank, they had accounts at Landmark Bank, Union Bank, and Red River Bank.  Multiple checks were written by Mr. Spurlin to Mrs. Spurlin from International Oil and deposited into the Spurlins' joint checking account at Landmark Bank.  Additionally, though proceeds from the sale of the Mohon Property were initially deposited in Mrs. Fogleman's account, that account was later closed and most of the money transferred to the Spurlin's joint Landmark Bank account.  Some transfers from Mrs. Fogleman's account also went to International Oil's accounts. Even though some of these transfers went to International Oil, and Mrs. Spurlin wrote on one check that she was employed there, International Oil was not listed anywhere in the bankruptcy filings.

## II.

Mr. and Mrs. Spurlin were indicted for (1) concealment of bankruptcy

5

No. 10-31128

estate assets, 18 U.S.C. §152(1), for not listing an interest in the Tennyson Oaks Property and the proceeds from its sale, the cars they drove, or Golden Choice or Golden Athletics; and (2) false oaths and statements in bankruptcy, 18 U.S.C. §152(3), for answering Question 5 on the individual questionnaire at the creditors' meeting that Fogleman had left no property, despite knowing he had done so. Mr. Spurlin was also indicted for bankruptcy fraud, 18 U.S.C. §157(1), for receiving $705,000 from SMA pursuant to escrow agreements, never completing the deal he had agreed to perform, not returning the money despite promising to, and then filing for bankruptcy, after SMA had sued him, to effect and conceal his scheme.

## III.

Mrs. Spurlin argues that she cannot be convicted of concealment of bankruptcy assets, because the joint bankruptcy petition was filed on her behalf using a general power of attorney and because she did not supply any information for the petition. When considering the sufficiency of the evidence, we ask whether, viewing the evidence in the light most favorable to the verdict, a reasonable trier of fact could have found each element established beyond a reasonable doubt. *United States v. Daniels*, 247 F.3d 598, 600 (5th Cir. 2001). Questions of law are reviewed *de novo*. *Hartford Underwriters Ins. Co. v. Found. Health Servs., Inc.*, 524 F.3d 588, 592 (5th Cir. 2008).

Mrs. Spurlin is not free of criminal liability just because her husband applied for the joint bankruptcy on her behalf using a general power of attorney. There is a split in the caselaw regarding when a general power of attorney can be used to file for bankruptcy on behalf of another person. On one hand, *In re Raymond*, 12 B.R. 906 (Bankr. E.D. Va. July 29, 1981), declared bankruptcy to be a highly personal privilege, similar to divorce or enlistment in the armed forces, that could not be effected by a power of attorney. The court feared misuse

of the power.  *Id.* at 908.  Other precedent, such as *In re Sullivan*, No. 82-04323G, 30 B.R. 781 (Bankr. E.D. Pa. June 23, 1983) (citing *Raymond* with approval), provides an exception to that holding, determining that a power of attorney can be used to file for bankruptcy on another's behalf if the power of attorney specifically authorizes the holder to file for bankruptcy.

The other side is presented by *In re Ballard*, No. I-87-00718, 1987 WL 191320 (Bankr. N.D. Cal. Apr. 30, 1987), in which a wife was permitted to sign a joint bankruptcy filing for her husband, who was serving in the military, pursuant to a general power of attorney.  *Ballard* disagrees with *Raymond*'s analogy between bankruptcy and divorce or enlistment, arguing that bankruptcy is far less personal.  Rather, *Ballard* considers bankruptcy to be primarily about preservation of one's property, which is not "so personal that it cannot ever be done by proxy."  *Id.* at *1.  *Ballard* requires that when a general power of attorney is used to file for bankruptcy, the person on whose behalf the power is used must be notified.  If that person says that he does not authorize the filing, the bankruptcy proceedings are dismissed.

The decision in *In re Brown*, No. 93-04473, 163 B.R. 596 (Bankr. N.D. Fla. Oct. 27, 1993), further supports the *Ballard* position.  In *Brown*, a debtor's wife signed a bankruptcy filing for her husband using a power of attorney; the husband died six days later.  The court declared the petition a legal nullity because the signature was forged, the power of attorney did not specifically authorize bankruptcy filings, and, as a result of his death, there was no opportunity for the debtor to ratify the filing.  *Id.* at 598.  The specific mention that there was no opportunity for ratification after the court noted that the power of attorney was general suggests that *Brown* recognizes that a party's ratification can validate a bankruptcy filed under a general power of attorney.

We conclude, agreeing with *Ballard*, that a general power of attorney may be used to file for bankruptcy on another's behalf.  General powers of attorney

allow someone to manage another person's affairs. Although certain matters are too personal to be entrusted to another, bankruptcy is primarily for property protection and is not as profoundly personal as divorce or enlistment. Declaring voluntary bankruptcy is about saving a person's assets where all else fails, and entrusting management of one's property to that someone includes giving him the tools to protect as much as he can if the worst happens. *Ballard* allows the holder of the power of attorney to declare bankruptcy but prevents abuse by requiring the debtor to be informed and dismissing if the debtor feels bankruptcy is improper. This gives the holder of the power of attorney flexibility to protect and manage that person's assets, while including a failsafe to prevent abuse.

Under the *Ballard* rule, Mrs. Spurlin's bankruptcy petition is valid, because there is enough evidence for a jury to infer ratification. Henry testified that it was his practice to call the potential debtor whenever he was presented with a power of attorney, to make sure the debtor knows what his agent is doing. Though he could not remember having made the call to Mrs. Spurlin, the jury could have determined that he called her in accordance with his regular business practice. Additionally, she came to the creditors' meeting with the trustee, never objecting to the bankruptcy's going forward. The trustee testified that she did not appear angry at that meeting, in contradiction to her argument that she was dragged there reluctantly. Thus, under the *Ballard* approach, Mrs. Spurlin can be liable for the bankruptcy filing.

In light of that, there is sufficient evidence to convict Mrs. Spurlin of concealment of bankruptcy assets. Under §152(1), there are four elements to the crime of concealing property in connection with a bankruptcy case: (1) There is a bankruptcy hearing; (2) certain property or assets belonged to the estate of the debtor; (3) defendant concealed that property from creditors, custodians, trustees, or someone else charged with control of its custody; and (4) defendant did so knowingly and fraudulently. 5TH CIR. PATTERN CRIMINAL JURY INSTRUCTIONS

No. 10-31128

§ 2.10 (West 2001). For that crime, "conceal" means "to secrete, falsify, mutilate, fraudulently transfer, withhold information or knowledge required by law to be made known, or to take any action preventing discovery." *Id.* Concealment is a continuing offense, so acts of concealment can commence after the bankruptcy proceedings have begun. *Id.* Because no one disputes the first element, only the other three need to be examined.

The property at issue includes the Spurlins' interest in two corporations. First is Golden Choice, including its main asset: the Tennyson Oaks Property at which the Spurlins resided. Second is their interest in Golden Athletics, which holds as its assets the three cars used by the couple. None of the bankruptcy forms listed the Spurlins as having any interest in Golden Choice or Golden Athletics or as owning any cars or properties. When the Spurlins attended the creditors' meeting, Mrs. Spurlin did not object to any of the answers Mr. Spurlin gave, nor did she reveal the inaccuracies in the filings. Additionally, their multiple savings and checking accounts were not disclosed. Only one account was disclosed in the bankruptcy filings, despite that the Spurlins drew on, and deposited into, many others.

Mrs. Spurlin's first argument—that she cannot have concealed information without providing information used in the bankruptcy petition—is unavailing. Even if she never supplied false information for the filings, withholding information constitutes concealment, and as a continuing violation, concealment can begin after the bankruptcy proceedings have started. Mrs. Spurlin attended the creditors' meeting, where the trustee asked Mr. and Mrs. Spurlin whether they had read all the documents in their bankruptcy filing and whether all the schedules and the statement of financial affairs were accurate. If either of them had answered "no," the trustee would have stopped the meeting; he explained at the beginning that in a joint bankruptcy, unless one of the parties says otherwise, any answers given are assumed to be from both parties.

9

No. 10-31128

Such an assumption creates an obligation on the parties to speak out when they know some of the information is false. That is reasonable, eliminating the inefficiency from forcing each party to answer each question individually. Therefore, the jury reasonably could find that Mrs. Spurlin concealed assets by not informing the trustee that the documents were incomplete, even if she did not supply information to create the bankruptcy paperwork.

The evidence is also sufficient to support that Mrs. Spurlin knew assets were being concealed. First, she was involved in an unusual pattern of transactions pertaining to the Tennyson Oaks Property. She bought the house for $229,167, then shortly afterward sold it to Golden Athletics for $38,167, far less than its worth. Golden Athletics then distributed the house to Mr. Spurlin, who sold it to Golden Choice for $200,000 after taking out a $200,000 loan on the property. Golden Choice was sold to Mrs. Fogleman for $125,000, and the property was then sold for $330,000, most of which went to pay off the loan. Mrs. Spurlin signed the act-of-cash-sale agreement on October 5, 2005, which effected sale of the Tennyson Oaks Property for $330,000. Though she did not hold title to the property at the time, having previously sold it to Golden Athletics, this shows Mrs. Spurlin was aware of the final sale before the creditors' meeting.

The proceeds from the sale of the Tennyson Oaks Property were split into four parts: The sum of $26,228.09 was used to pay off a loan at Red River Bank for Golden Athletics. Mr. Spurlin used another $40,000 for a check payable to Hilltop Productions, LLC. Another $9,215 was used to buy a check payable to Redemptorist High School ("RHS") for $9,215. Finally, $19,108.82 was used to buy a check payable to Golden Choice, which was changed later into a check for $19,108.82 payable to International Oil.

The evidence could allow a reasonable jury to infer Mrs. Spurlin's knowledge that she was benefiting from the proceeds of the sale of the Tennyson Oaks Property. As explained above, she was aware, before the creditors' meeting, that

the property had been sold. Agent McCarthy testified to checks she had written, even after bankruptcy was filed, payable to RHS, where her children went to school. One check includes "For International Oil" on the memo line. Other checks were written to her from International Oil's accounts by Mr. Spurlin, which were then deposited into their joint account at Landmark Bank—an account they maintained and that was not reported during the bankruptcy.

Mrs. Spurlin also later endorsed a check to buy groceries, listing her employer as International Oil. Her participation in the purchase and sale of the property, knowledge of its eventual sale, and involvement in both spending funds from, and claiming employment by, International Oil (where a significant amount of the profit from the sale of the Tennyson Oaks Property was deposited), along with the fact that one of the checks paying for her children's school came from the profits from the property's sale, suggest she knew she was benefiting from the sale of the property. Thus, not disclosing that to the trustee was knowing and fraudulent concealment.

Mrs. Spurlin's knowledge that she had benefited from the sale of the Mohon Property is more easily demonstrated. The proceeds were initially deposited into Mrs. Fogleman's account, then transferred mostly to Mr. and Mrs. Spurlin's undisclosed joint checking account with Landmark Bank. The signature card for the account contained the signatures of both defendants. Multiple checks payable to Mrs. Spurlin were also deposited into this account. Her knowledge and use of the Landmark Bank account shows the jury could reasonably infer she noticed over $43,000 being added to the account. No evidence contradicted her knowledge and use of this account.

Additionally, there is enough information in the record for the jury to infer Mrs. Spurlin had knowledge of their undisclosed interest in the cars she and Mr. Spurlin drove and in Golden Athletics. First, the trustee directly asked, during the creditors' meeting, whether they had a vehicle, and Mr. Spurlin answered

No. 10-31128

that they had one that was loaned to them to take care of Mrs. Spurlin's mother. Mrs. Spurlin knew at the time that they had three cars they controlled and had exclusive use of.

Furthermore, Mrs. Spurlin knew of her husband's interest in Golden Athletics. She had sold the Tennyson Oaks Property to Golden Athletics, represented by Mr. Spurlin, and when she signed the paperwork for the sale, Mr. Spurlin signed on behalf of Golden Athletics as the sole member. The jury could have considered that ownership in light of the suspiciously low price for which Mrs. Spurlin sold the Tennyson Oaks Property to Golden Athletics and recognized that the Spurlins had used that company as a means of hiding assets.

This is bolstered by the fact that Mrs. Fogleman bought Golden Choice, the other shell company in the transaction, for $125,000 when no benefit inured to her from the purchase. It instead is a reasonable inference that the action was done, through a power of attorney for Mrs. Fogleman in favor of Mr. Spurlin, as part of a scheme to hide assets. Altogether, this leaves the jury reasonably able to infer that Mrs. Spurlin knew of an interest in the cars and in Golden Athletics that should have been disclosed and that she failed to disclose. Thus, there was enough evidence for a reasonable juror to find Mrs. Spurlin guilty on count one.

IV.

Mr. and Mrs. Spurlin appeal their convictions under count 2, false statement under penalty of perjury, arguing that there is insufficient evidence. The government must show that (1) there was a bankruptcy proceeding; (2) defendant made a declaration or statement under penalty of perjury in relation to the proceeding; (3) the declaration concerned a material fact; (4) the declaration was false; and (5) defendant made the declaration knowingly and fraudulently.

The declaration at issue is the answer to Question 5 on the trustee's questionnaire. That question (with Questions 4 and 6 included for context) reads as

12

No. 10-31128

follows:

> 4. Are your parents living?    Father _____    Mother _____
> Are your spouses' parents living?    Father _____    Mother ____
>
> 5. If not, was any property left by your parent(s) at the time of death? _____
>
> 6. Do you understand that should you inherit anything during the next 6 months it will be necessary for you to advise me (your Trustee) in writing within 10 days? _____

The Spurlins answered that Mrs. Spurlin's father was dead, and they put "no" for Question 5. Because the form includes a statement that the answers are given under penalty of perjury, element two is satisfied.[1] What assets are available or potentially accessible to the estate is certainly important in a bankruptcy proceeding, so the declaration regarding whether the dead parents left property is material.[2]

Mr. and Mrs. Spurlin argue that under their interpretation of Question 5, this answer is true. They argue that the question asks whether the parents left any property *to the debtor*. Because Mr. Fogleman did not leave any property to Mr. or Mrs. Spurlin, they argue the answer was correct. The government argues that this reasoning is unreasonable, because the question does not say "to you."

Either interpretation, however, is reasonable in this case. The trustee explained that the purpose of the question is to find out about any interest the debtor may have, even if he has not chosen to exercise it, because the trustee

---

[1] Mrs. Spurlin repeatedly mentions that this is a "homemade" form, not an official bankruptcy form. But the statute makes no distinction between official and unofficial forms. The form was completed in the course of the bankruptcy proceedings, and it plainly stated it is completed under penalty of perjury.

[2] The court described a material fact as one that "has a natural tendency to influence or is capable of influencing the decision of the decision maker to whom it was addressed." The assets available in bankruptcy will influence how the trustee handles the bankruptcy, because bankruptcy is about distributing the available assets.

would be in the debtor's shoes to attack whatever happened to the assets. The trustee, however, testified that "the real thrust of if [the parents] are deceased is Question 5, which is:　If they are not alive, did they leave you anything?" Additionally, the context supports the Spurlins' reading.　Question 6 explains that if you "inherit" something in the next six months, you must advise the trustee. The same reasoning about the trustee's wanting to attack improper dispositions of assets from a deceased parent would apply if the parent died, irrespective of whether he left anything specifically to the debtor.

Thus, if the questions strive to make the trustee aware of all possible assets over which he can exercise an interest, even by attacking possibly improper succession, one would expect Question 6 to require informing the trustee merely upon the death of a parent.　Finally, if the interpretation were as the government claims, almost no one would answer "no."　Very few people die with absolutely no property. That would result in Question 5's providing meaningful information in few situations.

In her trial testimony, Mrs. Spurlin conceded that the answer on the form was false,[3] relying on the defense that she did not fill it out.　Yet, she signed the

---

[3] She and the government's attorney had the following exchange:

Q.　And the question did not ask whether or not you owned any property following your parents' death, did it?

A.　No.

Q.　It simply asked:　Was there any property left by your parents at the time of death?

A.　Correct.

Q.　And the answer given here is no?

A.　Correct.

Q.　And that wasn't accurate, was it?

(continued...)

No. 10-31128

statement under penalty of perjury at the creditors' meeting and did not object when the trustee asked whether everything was correct. As we have said, she was responsible for objecting to information she knew was untrue. Thus, whether she did fill out the form is irrelevant.

Additionally, Mrs. Spurlin admitted the answer was wrong without contesting that she interpreted the question differently, explaining her knowledge of her father's will. Even though in her reply brief she attempts to adopt all the arguments Mr. Spurlin makes, she cannot succeed on his argument, because her admission on the stand allows a reasonable jury to conclude that she understood the question the way the trustee intended it, while keeping the false answer.

Considering that Mr. Spurlin's interpretation of Question 5 comports with what the trustee noted was the real thrust of the question, best fits the context, and leads to a more useful result, no reasonable jury could have found beyond a reasonable doubt that he knowingly and fraudulently made a false statement when answering "no" to Question 5. Because, however, Mrs. Spurlin admitted that the answer was wrong without ever contesting the interpretation of that question advanced by the prosecutor, a reasonable jury could have determined that she knew the answer was false when given. Thus, there is sufficient evidence to affirm her conviction but not sufficient evidence to affirm her husband's.

V.

Mr. Spurlin was convicted of bankruptcy fraud, which occurs where a person "having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such a scheme or artifice or attempting to do so . . . files a petition under title 11 . . . ." 18 U.S.C. § 157(1). Thus, the

---

[3] (...continued)
A. No. I did not fill this out, ma'am.

elements are (1) a specific intent to defraud; (2) a scheme to defraud; and (3) filing a bankruptcy petition to conceal or execute that scheme.

Mr. Spurlin was convicted of fraud as a result of his dealings with SMA. He agreed to find, for SMA, financing for a real estate venture. Pursuant to those agreements, SMA gave him $705,000 to hold in escrow. When he failed to obtain funding, SMA asked him to return the money, but he never did; instead, he said it had been stolen by Hill, whom SMA had never heard about. SMA sent people to Dallas, where Hill's office was supposedly located, but could not find him. Then, shortly after telling SMA about Hill, Spurlin called to tell them that Hill had died. Combined, the facts that (1) as soon as SMA asked Spurlin to return the money in escrow, his previously unheard-of corporate attorney suddenly absconds with the funds; (2) the attorney and his office cannot be found in the city where they were supposedly located; and (3) the attorney then dies shortly after his introduction and disappearance, allowed the jury reasonably to infer that the financing arrangement was in truth a scheme by Spurlin to defraud SMA.

Mr. Spurlin argues that even if he did defraud SMA, he did not execute or conceal that fraud through filing for bankruptcy, because it was already completed by then. In so arguing, he seeks the restrictive reading of the statute from *United States v. Lee*, 82 F. Supp. 2d 384 (E.D. Pa. 2000). There, the alleged scheme was that after a bankruptcy court had limited how much compensation the defendant could receive from certain activities, he had his partner hire his wife as a consultant on those activities and pay her substantial sums. *Id.* at 386-87. Allegedly, these were to avoid the compensation cap. Three months after her consultations stopped, he filed for bankruptcy, and the court determined that the filing could not have effected the scheme, because she already had the money. *Id.* at 388. The court also determined that his failure to disclose that he was receiving additional compensation through his wife was not enough to charge

No. 10-31128

him with filing for the purpose of concealment. *Id.* Finally, the court refused to read the scope of §157 as analogous to the mail fraud statute. *Id.* at 388-89.

The first step in statutory interpretation—and the only step needed here—is to look at the plain meaning of the statutory language. The relevant provision describes a crime when someone, "having devised . . . a scheme . . . to defraud . . . and for the purpose of . . . concealing such a scheme . . . or attempting to do so . . . files a petition under title 11 . . . ." 18 U.S.C. § 157(1). Mr. Spurlin devised a scheme, and there is no need to resort to legislative history when the ordinary meaning of concealment is sufficient here.

"Concealing" something means to hide or keep it from notice.[4] The jury heard testimony regarding how thoroughly SMA was investigating Mr. Spurlin's claims to retrieve the money he took. If SMA kept looking, sooner or later it could have discovered that the money had not been stolen and hidden by a lawyer who suddenly disappeared and died. But if the debt were discharged, there would be no need to keep investigating Mr. Spurlin, because he would not be liable for the money. Pouring extra effort into investigating him would just waste SMA's resources, so SMA would likely cut its losses. Waiting around for SMA to catch him would not work, so he attempted to conceal everything by using bankruptcy and blaming Hill.

Mr. Spurlin's argument that the bankruptcy just gave SMA a forum to claim fraud as a defense to discharge, and thus could not be concealment, is unavailing. SMA already thought he had fraudulently taken the money. If he succeeded in discharging the debt, that would conceal the scheme, because SMA would stop investigating him, and the scheme would not be fully uncovered. Just because he failed does not mean he did not try.

---

[4] *Conceal*, OXFORD ENGLISH DICTIONARY, http://www.oed.com (last visited Sept. 26, 2011).

No. 10-31128

VI.

Mrs. Spurlin argues that convicting her of both concealment of bankruptcy estate assets and false oaths and statements in bankruptcy is multiplicitous. Even though multiplicity issues usually get *de novo* review, here the issue was not raised at trial, but was instead first mentioned in Mrs. Spurlin's motion not to be incarcerated pending appeal, so plain-error review is appropriate. *See United States v. Pok Seong Kwong*, 237 F. App'x 966, 968 (5th Cir. 2007). In *United States v. Cluck*, 143 F.3d 174 (5th Cir. 1998), this court addressed whether charging the same conduct under both § 152(1) and §152(3) was multi-plicitous. The standard for determining whether two charges render an indict-ment multiplicitous is whether each charge requires proof of an element that the other does not. *United States v. Nguyen*, 28 F.3d 477, 482 (5th Cir. 1994). In *Cluck*, 143 F.3d at 179, we determined that the words of the statute make it plain that the two provisions require different elements: Section 152(1) requires that property be concealed from creditors, whereas § 152(3) does not, and § 152(3) requires a false declaration, certificate, or statement under penalty of perjury, whereas § 152(1) does not.

This case is more straightforward than *Cluck*, because different conduct by Mrs. Spurlin is alleged under each provision. For § 152(3), she is charged with her admittedly false answer to Question 5. For § 152(1), she is charged with concealing the various assets not reported in the bankruptcy filings, because she was informed that because she was a joint debtor, her answers would be assumed the same as her husband's unless she objected. The trustee explained that if she protested at any time, the the proceeding would stop, but she did not, including to questions about whether she had read the filed mate-rials and whether they were accurate. The omissions from bankruptcy filings and the false answer to the trustee's questionnaire under penalty of perjury are different events, each of which is a violation of its respective provision of the

statute.   Therefore, because each claim requires different elements, and Mrs. Spurlin was convicted using different facts, there was no error, plain or otherwise, in convicting her of both.

In summary, we AFFIRM the conviction of Mrs. Spurlin on all counts.  We AFFIRM Mr. Spurlin's convictions of concealment of bankruptcy estate assets and of bankruptcy fraud and REVERSE, for insufficient evidence, his conviction of false oaths and statements in bankruptcy.  In light of the partial reversal, we VACATE his sentence and REMAND for resentencing.